Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~       CASE NO.:

TERRENCE M. WYLES,                        2:17-cv-07722-DMG

                                          -SK

                Plaintiff,

     vs.

ALLEN ZACHARY SUSSMAN, et al.,

                Defendant(s).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~




                DEPOSITION OF

                 THOMAS BRADY


              FEBRUARY 7, 2020

            1:06 P.M. TO 3:50 P.M.


        30 NORTH RAYMOND AVENUE, SUITE 205

          PASADENA, CALIFORNIA 91103



     Deidre Young, CSR No. 11461

     MAGNA LEGAL SERVICES

     866.624.6221

     www.MagnaLS.com



Page 2

```
 1                    APPEARANCES OF COUNSEL
 2
 3      FOR THE DEFENDANT:
 4          LAW OFFICES OF HAIGHT BROWN & BONESTEEL, LLP
            BY:  WILLIAM IRELAND, ESQ.
 5          555 SOUTH FLOWER STREET
            FORTY-FIFTH FLOOR
 6          LOS ANGELES, CALIFORNIA 90071
            213.542.8000
 7          Wireland@hbblaw.com
 8
 9      FOR THE PLAINTIFF:
10          THOMAS H. SCULLY, ATTORNEY AT LAW
            BY: THOMAS H. SCULLY, ESQ.
11          10736 JEFFERSON BOULEVARD, SUITE 117
            CULVER CITY, CALIFORNIA 90230
12          310.351.1119
            thomas@thomasscullylaw.com
13
        and
14
            BY PHONE:
15
            VENTOLA LAW
16          BY:  SAM VENTOLA, ESQ.
            1775 SHERMAN STREET
17          SUITE 1650
            DENVER, COLORADO 80203
18          303.864.9797
            Ventolalaw.com
19
20      ALSO PRESENT BY PHONE:  Mr. and Mrs. Terrence M. Wyles
21
22
23
24
25
```



                                                            Page 3

1                    INDEX OF EXAMINATION

2

3       WITNESS:

        THOMAS BRADY

4

5

6       EXAMINATION BY:                      PAGE

        BY MR. VENTOLA                        5

7

8

9

10                   INFORMATION REQUESTED

11                        NONE

12

13

14             INSTRUCTION NOT TO ANSWER

15                        NONE

16

17

18

19

20

21

22

23

24

25



Page 4

1                          INDEX OF EXHIBITS

2

3      NO.            DESCRIPTION                          PAGE

4      EXHIBIT 1    Document titled Aluminaid Fast          12
                    Acting Burn Relief Information
5                   Memorandum

       EXHIBIT 2    Document titled Declaration of          15
6                   Tom Brady In Support Of West
                    Hills Research and Development
7                   Inc.'s Opposition To Defendant's
                    Special Motion To Strike
8                   Pursuant To CCP 425.16

       EXHIBIT 3    Document titled                         74
9                   Non-Circumvention/Non-Disclosure
                    and confidentiality Agreement

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    DEPOSITION OF THOMAS BRADY

 2                    FRIDAY, FEBRUARY 7, 2020

 3

 4

 5

 6                         THOMAS BRADY,

 7         having been duly administered an oath by the Court

 8          Reporter, was examined and testified as follows:

 9

10                          EXAMINATION

11    BY MR. VENTOLA:

12        Q    Mr. Brady, could you state your name for the

13    record?

14        A    Thomas Brady.

15        Q    And have you ever had your deposition taken

16    before?

17        A    I can't hear him.

18             (The record was read by the reporter as follows:

19             "Q   And have you ever had your deposition taken

20             before?")

21             THE WITNESS:  I have.

22    BY MR. VENTOLA:

23        Q    When was the last time you had a deposition

24    taken?

25        A    I don't recall.
```



Page 6

1        Q     About how long ago was it?

2        A     I would have to say are we talking about a

3    declaration or a deposition?

4        Q     A deposition, so where questions are being

5    asked of you orally; not where you're writing down

6    something?

7        A     I actually don't think I've had a deposition

8    taken in a long time, years.

9        Q     Okay.  What deposition do you remember giving?

10       A     A deposition I gave was -- well, it was

11   actually -- I believe, I'm not sure of the difference

12   between the two.  But it was for Dr. Richard Grossman's

13   estate, attorneys.  They had a lawsuit going.

14       Q     So, did somebody ask you questions or were you

15   writing a paper?

16       A     Somebody was asking me questions.

17       Q     Okay.  And you're not sure how long ago that

18   was?

19       A     I want to say it was about three years ago.

20       Q     Okay.  Any others?

21       A     Not that I recall.

22       Q     So, you may or may not remember these from the

23   previous deposition, but I'll go over them again, some

24   of the rules to follow in depositions.

25             The first one is that when I ask a question



1    like a "yes" or "no" question, it's important to either

2    say "yes" or "no" and not nod your head, because I

3    can't see your answer.  And the court reporter can't

4    take down a nonverbal answer.  So, can you make sure to

5    make all your answers audible?

6        A    Yes.

7        Q    And the second thing is is that it's sort of

8    informal in conversation for people to start to answer

9    a question before the answer is completely finished.

10   But it's important that we not do that here, because

11   the court reporter cannot take down when two people are

12   speaking at the same time.  So, can you make an effort

13   to make sure to wait for my questions to be finished

14   before you start to answer?

15       A    Yes.

16       Q    And then finally, if you ever do not

17   understand one of my questions, will you ask me to

18   clarify it?

19       A    Yes.

20       Q    So, you were previously affiliated with

21   Aluminaid, Incorporated or Aluminaid PTE; is that

22   correct?

23       A    I'm going to have to say that that question to

24   me is outside the scope of this deposition.

25       Q    I understand your objection, but please



Page 8

1    answer.

2         A    That's my answer.

3         Q    Are you refusing to answer the question?

4         A    No, it's outside the scope of this deposition.

5    This is supposed to be to Mr. Hunt is my understanding.

6         Q    And so I'm trying to get your background and

7    your range of knowledge about the company.  So again,

8    my question is when did you become affiliated with one

9    of the Aluminaid companies?

10        A    Define affiliated.

11        Q    Have any relationship at all.

12        A    Back in 2013, I believe.

13        Q    So what happened in 2013 where you first

14   became involved with them?

15        A    Well, I was approached by Dr. Grossman

16   initially and he asked me to attend a meeting with a

17   new company called Aluminaid at the time.  And so I

18   did.

19        Q    And who was this meeting with?

20        A    The people I remember is Carl Freer and some

21   other people I don't really remember at the time, and

22   Dr. Grossman.

23        Q    Was Mr. Marten there?

24        A    I don't recall.

25        Q    And what did you discuss in that meeting?



Page 9

1        A    I didn't discuss anything.

2        Q    What was discussed with you at that meeting?

3        A    A presentation was made to Dr. Grossman.  I

4   was there listening.

5        Q    What was the presentation about?

6        A    A new product that Carl Freer had come up with

7   for burn applications.

8        Q    And what was -- did Dr. Grossman do anything

9   in response to that meeting or say anything at the

10  meeting?

11       A    Mr. Ventola, I'm not going to answer questions

12  that don't have to do with Mr. Hunt.

13       Q    Well again, this goes into your background

14  with the company?

15       A    Well, you just asked me about Dr. Grossman.

16       Q    Yes.  Did Dr. Grossman say anything or do

17  anything in response to that conversation?

18       A    I'm going to have to insist to tell you that

19  I'm maintaining you're outside of the scope of

20  discovery here.  I'm not going to answer.

21       Q    Are you refusing to answer the question?

22       A    I'm telling you that you're outside the scope

23  of discovery on this.

24       Q    Sir, if you're going to refuse to answer the

25  question, I need it on the record that you're refusing



Page 10

1      to answer the question so that we can get intervention

2      by the judge.  Are you refusing to answer the question?

3          A    No.

4          Q    So then please answer the question.

5          A    My answer is I'm not going to answer it.

6      Well, I guess I am refusing to answer it.  It's outside

7      the scope of discovery as defined in the order that I

8      was given.

9          Q    So you are refusing to answer the question?

10         A    Yes.

11         Q    What did you do in response to the meeting?

12         A    I'm going to object to it.

13         Q    Are you refusing to answer the question?

14         A    Yes.

15         Q    When did you first enter into any kind of

16     contract or relationship with any of the Aluminaid

17     companies?

18         A    Outside the scope of discovery.

19         Q    Are you refusing to answer the question?

20         A    I am.

21         Q    What was the actual company that you first

22     entered into any kind of relationship with?

23              Did you hear my question?

24         A    Repeat it, please.

25         Q    What was the actual name of the first company



1    that you entered into a relationship with, the first

2    Aluminaid company?

3         A    Outside the scope of discovery.

4         Q    Are you refusing to answer the question?

5         A    Yes.

6         Q    What was your first position with the company?

7    What was your -- what was your first position or status

8    with any of the Aluminaid companies?

9         A    Outside the scope of this deposition.

10        Q    Are you refusing to answer the question?

11        A    Yes.

12        Q    Were you a member of any of the companies'

13   governing board?

14        A    Outside the scope of this deposition.

15        Q    Are you refusing to answer the question?

16        A    Yes.

17        Q    Okay.  Were you a member of the advisory board

18   of any of the companies?

19        A    Outside the scope of discovery as to Mr. Hunt.

20        Q    Are you refusing to answer?

21        A    Yes.

22        Q    Were you a member of the management of

23   Aluminaid PTE, Limited?

24        A    Refuse to answer; outside the scope of this

25   discovery.



Page 12

1          MR. VENTOLA:  I'd ask for the witness to be

2     handed a document that says Information Memorandum.

3     I'll call that deposition Exhibit 1.

4          MR. SCULLY:  I'm sorry, I don't think I have

5     that particular document.

6          MR. VENTOLA:  The business plan.

7          MR. SCULLY:  Oh the business plan, yes.

8          (Deposition Exhibit 1 was marked for

9          identification by the Court Reporter and is

10         attached hereto.)

11    BY MR. VENTOLA:

12         Q    Mr. Brady, do you have Exhibit 1 in front of

13    you?

14         A    I do.  Yes.

15         Q    And it says Aluminaid Fast Acting Burn Relief

16    Information Memorandum?

17         A    It does.

18         Q    I'd like you to turn to Page 16 of that

19    document.

20         A    What page?

21         Q    16.

22         A    Okay.  I'm there.

23         Q    So on that page, it says, 7. Management

24    Aluminaid PTE, Limited.  Do you see that?

25         A    I do.



Page 13

```
 1        Q    And then at the bottom it has you listed as
 2   consultant.  Do you see that?
 3        A    Yes.
 4        Q    Were you aware that you were listed there as
 5   management?
 6        A    Outside the scope of discovery for this
 7   deposition.
 8        Q    When did you first become aware that you were
 9   listed by Aluminaid PTE, Limited as part of your --
10   when were you first aware that you were listed as part
11   of the management of Aluminaid PTE, Limited in this
12   document?
13        A    Outside the scope of discovery for this
14   deposition.
15        Q    Are you refusing to answer?
16        A    Yes.
17        Q    When did you first see this document?
18        A    Outside the scope of discovery of this
19   deposition.
20        Q    It might help us if you would just say, "I
21   refuse to answer" so we can get through this a little
22   quicker.  Do you refuse to answer?
23        A    Yes.
24        Q    If you look at the next page, Page 17, do you
25   see where it lists you and Dr. Grossman as members of
```



Page 14

1     the advisory board.  Do you see that?

2         A     I do.

3         Q     Were you in fact a member of the advisory

4     board of Aluminaid PTE?

5         A     Refuse to answer.

6         Q     Were you in fact a member of the management

7     Aluminaid PTE as reflected on Page 16?

8         A     Outside the scope of discovery.

9         Q     Do you refuse to answer?

10        A     Yes.

11        Q     When did you first become aware of anybody

12    saying you were a member of the management of advisory

13    board of Aluminaid PTE?

14        A     Outside the scope of discovery.

15        Q     Do you refuse to answer?

16        A     Yes.

17        Q     You gave an affidavit in support of West Hills

18    Research and Development Opposition to a Motion to

19    Strike in the California State Court litigation.  Do

20    you remember that?

21        A     Repeat it.  I didn't hear the question

22    completely.

23        Q     Do you remember giving an affidavit in support

24    of West Hills Research and Development Opposition to a

25    Motion to Strike in California State Court litigation?



Page 15

1      A    Outside the scope of discovery for this
2   deposition.
3           MR. VENTOLA:   Can the witness please be given
4   the declaration of Tom Brady in support -- make that
5   Exhibit 2.
6           (Deposition Exhibit 2 was marked for
7           identification by the Court Reporter and is
8           attached hereto.)
9   BY MR. VENTOLA:
10     Q    Do you have Exhibit 2 in front of you?
11     A    I do.
12     Q    Is this an affidavit that you signed?
13     A    Outside the scope of the deposition.
14     Q    Do you refuse to answer?
15     A    I do.
16     Q    Who asked you to sign deposition Exhibit 2?
17     A    Outside the scope of discovery for this
18   deposition.
19     Q    Do you refuse to answer?
20     A    Yes.
21     Q    Was Mr. Marten involved in asking you to sign
22   Exhibit 2?
23     A    Outside the scope of discovery.
24     Q    Do you refuse to answer?
25     A    Yes.



Page 16

1      Q    Was Mr. Hunt involved in asking you to sign

2   Exhibit 2?

3      A    I do not recall Mr. Hunt asking me to do that,

4   no.

5      Q    It's possible he did, but you don't remember?

6      A    Repeat the first part of the question again

7   please.

8      Q    Is it possible that he did ask you to do that

9   but you don't remember?

10     A    I have to say I'm 90 percent sure that he did

11  not do that.

12     Q    It was somebody else?

13     A    Outside the scope of discovery.

14     Q    So do you refuse the answer the question?

15     A    Yes.

16     Q    So, you're saying you're not entirely certain

17  that Mr. Hunt was involved, but that it was somebody

18  else, but you're refusing to say who the somebody else

19  was?

20     A    I'm saying that I'm almost positive that

21  Mr. Hunt was not there or did not do anything like

22  that.

23     Q    Are the statements that you made in Exhibit 2

24  accurate?

25     A    Outside the scope of discovery for this



Page 17

1   deposition.

2       Q    Are you refusing to answer?

3       A    Yes.

4       Q    Are there any statements in Exhibit 2 that are

5   not accurate?

6       A    Outside the scope of discovery for this

7   deposition.

8       Q    Are you refusing to answer?

9       A    Yes.

10      Q    What in your understanding was Mr. Hunt's role

11  with any of the Aluminaid companies?

12      A    I never really understood or knew what

13  Mr. Hunt's full capacity was with the company.

14      Q    Well, what -- even if you didn't understand

15  his full capacity, what did you know?

16      A    I just knew that he was associated with the

17  company.

18      Q    What was your understanding of what his

19  association with the company was?

20      A    I didn't have any understanding of what

21  position he had.

22      Q    How did you obtain whatever understanding you

23  had regarding Mr. Hunt's involvement?

24      A    I don't have any understanding of his

25  involvement.



Page 18

1      Q    Well, I believe you stated earlier that you

2  did think he had some involvement; did I get that

3  wrong?

4      A    No.  I know that he was associated with the

5  company.  I just don't know to what degree.

6      Q    So, how did you learn that he was associated

7  to some degree with the company?

8      A    He came to one of the meetings that I was at.

9      Q    So what meeting did he come to?

10     A    The meeting, one of the meetings was the first

11 one I mentioned earlier in the deposition.

12     Q    So if you're not saying that you recall that

13 Mr. Hunt -- are you now saying that Mr. Hunt was

14 present at that meeting with you and Carl Freer and

15 Dr. Grossman?

16     A    No.  You misunderstood.  I was saying that --

17     Q    Okay.

18     A    Okay.

19     Q    So what were you saying?

20     A    I was saying that Mr. Hunt was at one of the

21 meetings that I was at.

22     Q    So, who else was at the meeting that Mr. Hunt

23 was at?

24     A    I could not answer that accurately.  I didn't

25 know.



1    Q    When did that meeting occur?

2    A    It was years ago.  I do not remember when.

3    Q    Was it after your first meeting where

4    Mr. Freer and Dr. Grossman?

5    A    Yes.

6    Q    Was it before you gave your affidavit,

7    Exhibit 2?

8    A    I don't know the date.

9    Q    Where did the meeting take place?

10   A    In Woodland Hills, California.

11   Q    Where in Woodland Hills, California?

12   A    At the West Hills Hospital.

13   Q    And did you -- who else do you know was

14   present besides yourself and Mr. Hunt?

15   A    For which meeting are we talking?

16   Q    The one that Mr. Hunt was at.

17   A    Well, Dr. Grossman and I believe Carl Freer.

18   Q    What was the subject of that meeting?

19   A    They discussed the burn bandages.

20   Q    What about them?

21   A    What about them?  They talked about them.

22   Q    Do you remember what they were saying about

23   them?

24   A    In general I do.

25   Q    What do you know in general?



Page 20

```
 1        A     They were trying to establish the applications
 2   of how the bandage can be best used.
 3        Q     And what was decided about that or what was
 4   said about that?
 5        A     It -- I don't really recall.  There was --
 6        Q     Was there anything else discussed at the
 7   meeting?
 8        A     I can't recall.
 9        Q     Was Mr. Wyles discussed at the meeting?
10        A     No.
11        Q     What other contact did you have with Mr. Hunt?
12        A     Well, throughout the initial stages of the
13   company, Mr. Hunt would be in attendance at certain
14   meetings at different times.
15        Q     So it was not just one meeting that you
16   attended with Mr. Hunt?
17        A     I know for a fact that it was more than one,
18   but I just don't know how many.
19        Q     So, what other meeting besides the one at the
20   hospital that you just talked about do you remember
21   having that included Mr. Hunt?
22        A     I don't recall.  It's been so long.
23        Q     What was the subject matter of any of the
24   meetings?
25        A     It was always about the bandage and how they
```



Page 21

1    were just trying to figure out how to use it.

2        Q    Was Mr. Wyles discussed at any of the

3    meetings?

4        A    Was he what?

5        Q    Was he discussed at any of these meetings?

6        A    I don't recall.

7        Q    So, it's possible that he was discussed at

8    these meetings, but you're not sure?

9        A    I don't recall.

10       Q    How many meetings are we talking about?

11       A    I don't remember.

12       Q    Approximately?

13            MR. IRELAND:  Counsel, are you asking how many

14   meetings he met with Mr. Hunt?

15            MR. VENTOLA:  Yes.

16            MR. IRELAND:  Okay.

17            THE WITNESS:  I don't -- I absolutely have no

18   idea.

19   BY MR. VENTOLA:

20       Q    Was it more than ten?

21       A    I don't know.

22       Q    Was it more than 20?

23       A    I don't know.

24       Q    Was it more than 30?

25       A    I can assure you it was not that many.  It was



Page 22

1    more than two.

2        Q    So somewhere between 2 and 30?

3        A    No.  Probably closer -- probably more

4    accurately maybe two to -- two to ten maybe, if that

5    many.  I don't know.  I can't remember.  It wasn't very

6    many.

7        Q    So, you're now saying it was not more than

8    ten?

9        A    I don't recall.

10        Q    So, where did these meetings take place?

11        A    The only couple meetings I remember were in

12    Woodland Hills, California at the West Hills Hospital.

13        Q    So you're saying all the meetings that you

14    recall attending involving Mr. Hunt occurred at the

15    West Hills Hospital?

16        A    I don't recall.

17        Q    Is there some place else you remember having

18    meetings?

19        A    With Mr. Hunt?

20        Q    Yes.

21        A    I've -- meetings, no.  I don't recall.

22        Q    What else do you know about Mr. Hunt's

23    participation with any of the Aluminaid companies?

24        A    I only know that Mr. Hunt was associated in

25    some degree with the company.  I don't know his



Page 23

1      position in the company.

2          Q     What company do you believe he was associated

3      with?

4          A     Well, the only company I was really aware of

5      was Aluminaid.  I always knew it as Aluminaid.

6          Q     Was it Aluminaid, Inc. or Aluminaid

7      International?

8          A     That was beyond my purview.  I had no idea.

9          Q     Have you ever heard of the name of one of the

10     companies being changed to West Hills Research and

11     Development?

12         A     Well, since the lawsuit started I have, yes.

13         Q     So were you and Mr. Hunt, to your knowledge,

14     associated with the company that became known as West

15     Hills Research and Development?

16         A     That was beyond my scope of understanding of

17     the company.

18         Q     Were you ever associated with a company called

19     Aluminaid International?

20         A     I always knew it as Aluminaid.

21         Q     Were you ever associated with a company known

22     as Aluminaid PTE?

23         A     I never paid attention.  I always knew it as

24     Aluminaid.  I didn't know the subscript to it.

25         Q     When you gave a declaration in the California



Page 24

1    State Court case, Exhibit 2, it was in support of West

2    Hills Research and Development, Inc., When you did

3    that, did you have an understanding that that was a

4    company you were affiliated with?

5         A    Okay.  We're outside the scope of discovery

6    for this deposition.

7         Q    Are you refusing to answer the question?

8         A    Yes.

9         Q    When you gave your declaration, Exhibit 2, did

10   you understand that that was the -- and stated that was

11   in support of West Hills Research and Development, did

12   you have an understanding as to whether that was a

13   company that Mr. Hunt was affiliated with?

14        A    I'm sorry.  I have to ask you to repeat that.

15        Q    When you gave your declaration Exhibit 2 in

16   support of West Hills Research and Development, Inc.,

17   did you have an understanding as to whether that was a

18   company Mr. Hunt was affiliated with?

19        A    Okay.  That's outside the scope of this

20   discovery.

21        Q    Are you refusing to answer?

22        A    Yes.

23        Q    But you are saying that you believe that

24   Mr. Hunt and yourself were affiliated with the same

25   company?


MAGNA
LEGAL SERVICES

Page 25

```
 1        A    Which person are you asking about?

 2        Q    I'm asking whether your understanding was that

 3   Mr. Hunt was affiliated with the same company that you

 4   were affiliated with?

 5        A    Well, I'll answer it to the extent I believe

 6   Mr. Hunt was affiliated with that company, yes.

 7        Q    Are you aware of the deposition that was given

 8   by Mr. Hunt -- are you aware of the deposition that was

 9   given in this matter by Mr. Hunt?

10        A    Actually, I was just aware that he gave one.

11        Q    Have you reviewed anything he said there?

12        A    I need a minute to look to see if I even have

13   a copy of his deposition.  I don't think I have a copy

14   of that.

15        Q    Did Mr. Hunt tell you about a company called

16   Blu Dane?

17        A    No, he did not.

18        Q    Did you tell Mr. Hunt about a company called

19   Blu Dane?

20        A    Outside the scope of discovery on this

21   deposition.

22        Q    Are you refusing to answer?

23        A    Yes.

24        Q    You do know that I asked you whether you told

25   Mr. Hunt about a company called Blu Dane; you
```



Page 26

1     understand that question?

2          A    I don't -- I do not.

3          Q    Well, let me clarify the question to make sure

4     you understand it.  I am asking you whether you spoke

5     to with Mr. Hunt about a company called Blu Dane?

6          A    And I'm telling you that my answer is that is

7     outside the scope of this deposition.

8          Q    Are you refusing to answer?

9          A    Yes.

10         Q    Did Mr. Hunt discuss with you giving a

11    declaration in support of West Hills?

12         A    No, he did not.

13         Q    In the California State Court action?

14         A    No, he --

15         Q    I'm sorry.  I paused.  So, it's my fault.  I'm

16    going to ask the question again so the record is clear.

17              Did Mr. Hunt discuss with you giving a

18    declaration in support of West Hills in the California

19    State Court case?

20         A    I do not recall Mr. Hunt doing that.

21         Q    Is it possible that he did?

22         A    I don't recall.

23         Q    Did Mr. Hunt suggest to you that you should

24    visit the lawyers for West Hills, Lobe and Lobe?

25         A    I do not recall Mr. Hunt ever telling me that



1    no.

2        Q    You're saying somebody else other than

3    Mr. Hunt sent you to Lobe and Lobe?

4        A    I did not say that.

5        Q    Well who sent you to Lobe and Lobe?

6        A    Outside the scope of this discovery.

7        Q    Are you refusing to answer?

8        A    Yes.

9        Q    Did you have a meeting on December 3rd, 2012

10   with Mr. Freer regarding a nondisclosure agreement?

11       A    Outside the scope of this discovery.

12       Q    Are you refusing to answer?

13       A    Yes.

14       Q    Was Mr. Hunt present at such a meeting?

15       A    I'm going to ask you to repeat that in the

16   fact that --

17            MR. IRELAND:  Counsel, are you trying to ask

18   him if he met with Hunt and Freer to discuss a

19   nondisclosure agreement sometime in 2012?

20            MR. VENTOLA:  Yes.

21            THE WITNESS:  No.

22   BY MR. VENTOLA:

23       Q    So you were not present at a meeting of

24   December 3rd, 2012 involving yourself and Mr. Freer;

25   Mr. Hunt was not there?



Page 28

1       A    Okay.  That was a two-part question.  Can you

2    repeat it again and separate it out?

3       Q    Sure.  Was Mr. Hunt present at a December 3rd,

4    2012 meeting between yourself and Mr. Freer?

5       A    Okay.  Well, I can't answer that accurately

6    because it's a two-part question.  I don't remember

7    Hunt being at a meeting, but I don't recall myself

8    being at the meeting either.

9       Q    Okay.  Do you recall Mr. Hunt being at any

10   meetings that you may have had with Mr. Freer regarding

11   nondisclosure agreements?

12      A    I cannot recall.

13      Q    Are you aware of working on a sunburn relief

14   product called SiMTech?

15      A    Outside the scope of this discovery allowed.

16      Q    Are you refusing to answer?

17      A    Based on the -- based on the rules and the

18   order by the court, I am absolutely more than willing

19   to answer these questions, but they're outside the

20   scope of the court's order.

21      Q    I asked if you're refusing to answer the last

22   question?

23      A    And I'm telling you I am based on that.

24      Q    Was Mr. Hunt involved in working on that

25   sunburn relief product?



Page 29

1       A    I have no idea.

2       Q    Did you have a discussion -- let me ask you a

3   different question.

4            Were you included on any e-mails that involved

5   the company called Blu Dane?

6       A    Outside the scope of this discovery.

7       Q    Do you know whether Mr. Hunt was involved in

8   any e-mails regarding Blu Dane?

9       A    I don't.  I don't.

10      Q    What is Blu Dane?

11      A    Outside the scope of this discovery.

12      Q    Are you refusing to answer?

13      A    Based on the court's order and direction, yes.

14      Q    Are you aware that Mr. Hunt testified in his

15  deposition that he discussed Blu Dane with you?

16      A    I am not aware.

17      Q    Are you saying that he was wrong in saying

18  that?

19      A    I'm going to have to ask you to clarify that.

20  I'm not understanding the question, I don't think.

21      Q    If Mr. Hunt testified that he discussed Blu

22  Dane with you, are you saying that his testimony was

23  inaccurate?

24      A    In his deposition?

25      Q    Yes.



Page 30

```
 1        A    I don't -- I have no idea.  I'm not
 2   understanding that question.
 3        Q    Is it possible that if Mr. Hunt testified that
 4   he discussed Blu Dane with you that he was correct?
 5        A    I've already refused to answer the question
 6   that I discussed anything with Mr. Hunt.
 7        Q    You're refusing to answer a question about
 8   whether you discussed anything with Mr. Hunt?
 9        A    That's correct.
10        Q    Were you included -- were you and Mr. Hunt
11   included on any e-mails regarding Mr. Wyles?
12        A    As the question pertains to me, it's outside
13   the scope of discovery.  I have no idea about Mr. Hunt.
14        Q    Well, I'm asking about e-mails you may have
15   seen because you were included that Mr. Hunt may have
16   been included on?
17        A    You'll have to ask Mr. Hunt those questions.
18   I don't know.
19        Q    Are you refusing to answer?
20        A    Based on the court's order of discovery, yes.
21        Q    Were there any e-mails that Mr. Hunt received
22   that you know of regarding Mr. Wyles?
23        A    I'm not -- not that I'm aware of.
24        Q    Is it possible that some of the e-mails that
25   you received were also received by Mr. Hunt?
```



Page 31

1        A    I have -- I don't even know how to answer
2    that.  I have no idea.
3        Q    So, it's possible that e-mails you received
4    concerning Mr. Wyles were also received by Mr. Hunt?
5        A    I have no way of knowing that I recall.
6        Q    What e-mails did you receive regarding
7    Mr. Wyles that may have also been shared with Mr. Hunt?
8        A    Outside the scope of this discovery.
9        Q    Are you refusing to answer?
10       A    Yes.
11       Q    Did you and Mr. Hunt in fact receive e-mails
12   regarding Mr. Wyles?
13       A    I have no idea about what Mr. Hunt received or
14   didn't receive.
15       Q    Was Mr. Hunt copied on the e-mails that you
16   received?
17       A    From who?
18       Q    From anyone regarding Mr. Wyles?
19       A    I cannot remember.
20       Q    Did you include Mr. Hunt on any e-mails you
21   sent regarding Mr. Wyles?
22       A    Outside the scope of this discovery.
23       Q    Are you refusing to answer?
24       A    Based on the court's order, yes.
25       Q    So, you're refusing to answer whether you sent



Page 32

1    any e-mails to Mr. Hunt about Mr. Wyles?

2         A    Based on the court's order, yes.

3         Q    From whom did you obtain information regarding

4    Blu Dane as discussed in your declaration?

5         A    Outside the scope of discovery allowed for in

6    this deposition.

7         Q    Are you refusing to answer?

8         A    Based on the court's order and direction, yes.

9         Q    Are you certain that it was not Mr. Hunt?

10        A    Outside the scope of discovery.

11        Q    Are you refusing to answer?

12        A    Yes.

13        Q    Did any of the information you received and

14   testified about in your declaration regarding Blu Dane

15   come from Mr. Hunt?

16        A    Outside the scope of this discovery.

17        Q    Are you refusing to answer?

18        A    Yes.  Can we take a break?

19             MR. SCULLY:  Yeah, you want to take a break?

20   Let's go off the record.

21             MR. VENTOLA:  Yeah, that's fine.

22             (Recess.)

23             MR. VENTOLA:  I've been asked to state on the

24   record that yes, Mr. Wyles is present for this

25   deposition.



Page 33

 1                MR. IRELAND:  Is anyone else present other
 2      than Mr. Wyles that you have failed to identify up to
 3      this point, sir?
 4                MR. VENTOLA:  Yes, Mr. Wyles' wife also is
 5      present.
 6                MR. IRELAND:  Is anyone other than Mr. Wyles
 7      and his wife present at any point in this deposition,
 8      sir?
 9                MR. VENTOLA:  No.
10                MR. IRELAND:  Is Ms. Wyles a party to this
11      lawsuit?
12                MR. VENTOLA:  No, she is not.
13                MR. IRELAND:  Is there a reason why she's
14      present then?
15                MR. VENTOLA:  She's a paralegal in Mr. Wyles'
16      firm and provides assistance for him on these matters.
17                MR. IRELAND:  I don't know what that means.
18                MR. VENTOLA:  She is a paralegal in Mr. Wyles'
19      firm.
20                MR. IRELAND:  Is she employed by an attorney
21      of record in the case?
22                MR. VENTOLA:  No.
23                MR. IRELAND:  So, she's not a party.  She's
24      not an employee of an attorney of record.  She's
25      just -- I'm sure she's a very nice woman.  Just kind of



Page 34

```
1     showed up and sitting in the deposition; it wasn't

2     disclosed as being present?

3               MR. VENTOLA:  Correct.

4               MR. IRELAND:  Will you tell us if anyone else

5     appears during this deposition and walks in and is

6     present during the testimony?

7               MR. VENTOLA:  Yes.

8               MR. IRELAND:  Okay.  I'm surprised, Counsel,

9     but go ahead.  It's your witness.

10              MR. VENTOLA:  Okay.

11    BY MR. VENTOLA:

12        Q    Mr. Brady, did you ever receive any e-mails

13    from Mr. Hunt?

14        A    I have received e-mails from Mr. Hunt, yes.

15        Q    Did any of them concern Mr. Wyles?

16        A    I do not recall offhand.

17        Q    What did they concern?

18        A    I didn't hear that.

19              (The record was read by the reporter as follows:

20              "Q   What did they concern?")

21              THE WITNESS:  I don't recall what the e-mails

22    said.  They were so long ago.

23    BY MR. VENTOLA:

24        Q    Do you have copies of them?

25        A    I do not.
```



Page 35

1       Q     Do you have them on a computer or on a

2    computer service?

3       A     I do not know.

4       Q     When you would receive these e-mails, were

5    they sent to you to a certain e-mail address?

6       A     Yes.

7       Q     What e-mail address would you have been using?

8       A     Can I go ahead and list it?

9    FIREACTX7777@yahoo.com.

10      Q     So did you ever delete them from your yahoo

11   account?

12      A     I do not recall.

13      Q     Do you still have access to that yahoo

14   account?

15      A     I do.

16      Q     Will you check that yahoo account and see if

17   you have those e-mails?

18      A     I will.

19      Q     Were there any other e-mail accounts that you

20   may have used in communication with Mr. Hunt?

21      A     I don't believe so, no.

22      Q     Were there any other e-mail accounts that you

23   used in connection with Aluminaid business?

24      A     I've had e-mail accounts in the past.  I don't

25   remember what they were.  I wouldn't know the time



Page 36

1    frame of them, but I don't believe so.

2         Q    Did Mr. Hunt provide any information to you

3    regarding Mr. Sandoval?

4         A    Yes, he did.

5         Q    What did Mr. Hunt tell you about Mr. Sandoval?

6         A    It was quite a while ago, but if I remember it

7    was to the effect that Mr. Sandoval had misrepresented

8    himself as an active attorney and was under discipline

9    with California Immigration Department.

10        Q    When did you have this discussion with

11   Mr. Hunt?

12        A    I do not recall when it was.  It was years

13   ago.

14        Q    Why were you having discussion with Mr. Hunt

15   about Mr. Sandoval?

16        A    Because Dr. Grossman and myself were trying to

17   figure out who was who in regards to getting involved

18   with Aluminaid.

19        Q    So, was this when Mr. Sandoval was already

20   affiliated with Aluminaid or before he was?

21        A    Actually Mr. Sandoval was actually at the --

22   now that you mentioned it, he was at the West Hills

23   facility or office for Aluminaid during one of the

24   meetings that we were at.

25        Q    You're saying you had a meeting at West Hills



Page 37

1    offices?

2        A    Yes.  As mentioned before when first

3    introduced to Aluminaid that's where the meetings

4    were -- it's Woodland Hills, West Hills are the same.

5        Q    So, I thought you said earlier the meeting

6    that you remember going to was at West Hills Hospital?

7        A    Well, they're all right there.  The offices

8    and the hospital are all on one compound.

9        Q    Okay.  So the meetings that you had that you

10   testified about earlier were in the offices of the West

11   Hills company?

12       A    They were offices obviously leased out by

13   Aluminaid on the same compound as the hospital, like

14   medical offices.

15       Q    Okay.  Were they -- was the company known as

16   West Hills when you had those meetings there?

17       A    See, I don't know the ins and outs of the

18   company itself.  I only knew that it was called

19   Aluminaid on the door when I went in.

20       Q    So, the door just said Aluminaid?

21       A    Well, either the door or the logo or inside it

22   said Aluminaid.  I don't exactly remember specifically

23   what it was.  I just understood it to be a company

24   called Aluminaid and that was their office.

25       Q    Have you ever had an e-mail address



Page 38

1       TBrady1@Roadrunner.com?

2           A     That could be.  That's been so long ago.  It

3       sounds somewhat familiar.

4           Q     Would you still have access to that e-mail

5       address?

6           A     No.

7           Q     What happened to it?

8           A     I didn't even know I had it.  It's been so

9       long.

10          Q     Is there any reason why you don't think you

11      could log into it today?

12          A     I don't know what it is.

13          Q     Well --

14          A     I mean I could try.

15          Q     It was a company called roadrunner.com and

16      your user name was TBrady1@Roadrunner.com.

17          A     I mean, I could try.  I don't know.  I forgot

18      all about it.

19          Q     Yeah, please do that.

20                Also do you recognize an e-mail address

21      FIRECPX7777@yahoo.com?

22          A     Correct.

23          Q     Is that the one you were reading to me

24      earlier?

25          A     Yes.



Page 39

1       Q    Did information you put in your declaration

2    filed in the California State Court case regarding

3    Mr. Sandoval come from Mr. Hunt?

4       A    I'm sorry, you've got to repeat that one.

5       Q    Did the information regarding Mr. Sandoval

6    that was in your declaration in the California state

7    case come from Mr. Hunt?

8       A    I don't know if it did or didn't.  It could

9    have.

10           MR. SCULLY:  Would you like to look at your

11   Exhibit 2 again for a moment to refresh your

12   recollection.

13           THE WITNESS:  Yeah, where it would be at?

14           MR. SCULLY:  I'm sorry, I think it's

15   Exhibit 1 -- no, it is 2.  You refer to Mr. Sandoval in

16   the declaration.  So pertaining to the question just

17   asked, do you recall if Mr. Hunt was involved in

18   feeding you that information?

19           THE WITNESS:  Okay.  The information that I

20   got regarding Sandoval -- are we talking about the Blu

21   Dane stuff?

22   BY MR. VENTOLA:

23      Q    Any of the information regarding Mr. Sandoval

24   that you put in your declaration?

25      A    The stuff I put in the declaration regarding



Page 40

1    Sandoval came from Sandoval himself and Joe Montagnac

2    or whatever his name is.  They were trying to get --

3    they took us to lunch and were trying to get the doctor

4    to come over to their to -- this company and endorse

5    them and be the equivalent of what they were trying to

6    do with Aluminaid.

7         Q    What company were they trying to get

8    Dr. Grossman come over to?

9         A    Well, they described it as -- they have it,

10   Exuro medical was they -- what they presented was an

11   NDA signed by Joe Montagnac, I believe.  And they were

12   trying to get Dr. Grossman to come over and do the

13   equivalent of what he was doing with Aluminaid.

14        Q    And you were present at this meeting?

15        A    I was.

16        Q    Was the company that they were talking about

17   or one of the things they were talking about Blu Dane?

18        A    It was.

19        Q    And what did they say to yourself and

20   Dr. Grossman about why you should come over to Blu Dane

21   or Exuro?

22        A    Well, there were two sides to the bandage

23   business.  At this point Aluminaid was trying to entice

24   Dr. Grossman to represent them and join forces with

25   them.  And then Sandoval and Montagnac came up with a



Page 41

1      plan to get him to separate from Aluminaid and come

2      over to this new plan in the United States.

3          Q    So what did you hear about the new plan?

4          A    Well, they named it Blu Dane, supposedly in

5      reference to Dr. Grossman having two pure bred Blu Dane

6      dogs.  They thought that would make it more enticing to

7      him for whatever reason.  They were kind of like

8      sucking up to him.

9              So, they said they were basically setting up a

10     plan to come address -- my understanding of this, is

11     that they were setting up a plan to take the product

12     and get it developed and get it to have Exuro Medical

13     distribute it, and use Dr. Grossman as their front

14     person.  That's --

15         Q    Now you said -- I'm sorry.  Were you finished?

16         A    That's how I understood it.

17         Q    So where did you obtain that understanding?

18         A    I was sitting there listening to them talk to

19     Dr. Grossman about it.

20         Q    So, they told you they planned to somehow take

21     the product away from Aluminaid?

22         A    That's correct, that was my understanding.

23         Q    How did they say they were going to do that?

24         A    Well, there was more than one meeting on this.

25     There was quite a few meetings.  And as we kept asking



Page 42

1    questions, they kept coming up with answers.  And it

2    became quite intensive on what their plans were, one of

3    which was they thought that Carl Freer and Aluminaid

4    were going to be over in Europe and never coming back.

5    So that they would have no problems distributing this

6    in the United States.  They were under the

7    impression -- or telling us, under the impression, that

8    Carl Freer and his group were bad business people, not

9    to be trusted and were banished to Europe and Asia and

10   they were not going to ever come back.

11        Q    So this was told to you in how many meetings?

12        A    I can safely say at least three.

13        Q    And when did they take place?

14        A    They took place in a top floor of a

15   restaurant.  I don't remember the name.  But it was at

16   the top of the Holiday Inn in the Sepulveda Pass.

17        Q    All three meetings took place at this

18   restaurant in the Holiday Inn?

19        A    Two of -- yeah, actually they did all three of

20   them once it got to this level.

21        Q    When did these meetings occur?

22        A    I do not remember when they occurred.

23        Q    Were they over a period of a few weeks, a few

24   months?

25        A    Yeah, within a few weeks and possibly a few



Page 43

1    months.  I would say more accurately would be a few

2    weeks.

3         Q    In what year?

4         A    I do not recall.

5         Q    Did you ever see Mr. Freer after these

6    meetings?

7         A    I have seen Mr. Freer after these meetings,

8    yes.

9         Q    When did you see Mr. Freer after these

10   meetings?

11        A    Okay.  I'm going to go back to this not having

12   to do anything with Mr. Hunt.  And I'm not going to

13   answer the questions because I don't think they're

14   within the scope of this deposition.

15        Q    I'm trying to narrow down the time period

16   because you said you didn't know.  So, I'm trying to

17   get some kind of idea when this took place and trying

18   to figure out when Mr. Freer left the country?

19        A    Well, I would say that if we looked at the NDA

20   that we were handed by Sandoval.  It probably has a

21   date very closely related to when this took place.

22        Q    Do you have that document?

23        A    I think I may.  I will check.

24             Do you have it?

25             MR. SCULLY:  I'm not sure that I've ever seen



Page 44

1    that document.

2    BY MR. VENTOLA:

3        Q    So, I'm going to ask you again the question

4    about Mr. Freer?

5            MR. IRELAND:  He's looking for documents, sir.

6    Why don't you wait a moment?

7            THE WITNESS:  I'm not sure.  Let me take a

8    look.

9            MR. IRELAND:  Sorry to interrupt, but.

10           THE WITNESS:  If I can just throw out I want

11   to say somewhere probably in the 2013, 2014.  I'm still

12   looking.

13   BY MR. VENTOLA:

14       Q    The documents you're looking at are those

15   documents that you have that you've not produced in

16   this case?

17       A    What was the question?

18       Q    Are you looking through documents that you

19   have not produced in this case?

20       A    No.  I don't know.  I haven't produced any

21   documents in this case that I know of.  Okay.  I do

22   have it.  This looks like it was 2013.  It's hard to

23   read.  It looks like around February 18, 2013.

24       Q    Will you produce the document that you brought

25   with you today?



Page 45

1           MR. SCULLY:  Can I photocopy it and give a

2      copy to the court reporter?

3           THE WITNESS:  Do we do that?  I thought we

4      were beyond that.

5           MR. IRELAND:  If you brought documents to the

6      deposition and you're looking at them, I think they're

7      fair game.

8           THE WITNESS:  Okay.

9           MR. IRELAND:  Can you make me a copy also?

10          MR. VENTOLA:  So how big a stack of documents

11     are we looking at?

12          MR. SCULLY:  Oh, I don't know.  How many

13     documents do you have there?

14          THE WITNESS:  I don't know, five or -- I don't

15     know.  They're basically just the -- my affidavits and

16     the court cases.

17          MR. VENTOLA:  So I don't think we need to copy

18     pleadings that obviously have been distributed to

19     everybody, but the documents that you have that were

20     not pleadings, including the document you're referring

21     to, can we get copies of them to put in the court

22     record?

23          MR. SCULLY:  It's pretty faded.  Is this your

24     best copy?

25          THE WITNESS:  It is.


MAGNA
LEGAL SERVICES

Page 46

1          MR. VENTOLA:  Should we take a break while we

2     do that?

3          MR. SCULLY:  Yeah, let's take a break.

4          (Recess.)

5     BY MR. VENTOLA:

6     Q    So, you testified that you had some

7     discussions with Mr. Hunt regarding Mr. Sandoval.  What

8     was the reason why you were speaking with Mr. Hunt

9     regarding Mr. Sandoval?

10    A    The discussion was to find out who was who in

11    the fact that Dr. Grossman and myself did not know who

12    was, for no better expression than to say we did not

13    know who's company we should go with.  So Mr. -- go

14    ahead.

15    Q    No.  Go ahead.

16    A    I was just going to say the discussion was

17    from Mr. Hunt that Sandoval was not to be trusted.

18    Q    So Mr. Hunt told you this after you had the

19    meetings regarding Blu Dane?

20    A    I'm not exactly sure which came first, the Blu

21    Dane meetings or the Sandoval meetings.

22    Q    But it was at some point that the context of

23    your discussion was that Mr. Sandoval was presenting an

24    alternative company to Aluminaid?

25    A    That is correct.  That was our understanding.



Page 47

```
 1        Q    So you discussed that approach for
 2   Mr. Sandoval with Mr. Hunt?
 3        A    I'm sorry.  What it was again.
 4        Q    You discussed the discussions with
 5   Mr. Sandoval with Mr. Hunt?
 6        A    I don't really know how to answer that.  I
 7   would just say that Mr. Hunt had presented a document
 8   saying and showing that Sandoval was not to be trusted
 9   and had been disbarred.
10        Q    What document did Mr. Hunt present?
11        A    That, I don't know.  And I'm not sure I ever
12   got it.  Most of this was directed at Dr. Grossman.
13        Q    So did you approach Mr. Hunt or did Mr. Hunt
14   approach you regarding Mr. Sandoval?
15        A    Again, I don't remember how that came to pass.
16   I just want to make it clear that most of all of this
17   stuff was directed to Dr. Grossman.  I was brought
18   along to help keep him company and also fill in for
19   once there was applications to the fire department.
20        Q    So, would you have gone to Mr. Hunt to discuss
21   with him what was being presented by Mr. Sandoval?
22        A    I don't think I would.  Like I said, I was --
23   even in the meetings at the hotel restaurant, I would
24   be sitting to the left or right of Dr. Grossman and
25   just listening more than anything.  Everything was
```



MAGNA
LEGAL SERVICES

Page 48

1    mainly between those guys.  But he was the key guy when

2    we were involved.  He was the key guy -- when

3    Dr. Grossman and I were anywhere around, Dr. Grossman

4    was the key figure.

5         Q    So, at some point during those discussions

6    between you, and Dr. Grossman, Mr. Sandoval, you

7    received information from Mr. Hunt.  And I'm trying to

8    find out how that happened.  Did Mr. Hunt come to you

9    and say, I know you're talking to Sandoval, but you

10   should know this?

11        A    Again, I don't recall how it happened because

12   I wasn't really thinking in those terms.  I didn't know

13   who any of the players were on either side.

14        Q    What do you mean you weren't thinking in those

15   terms?

16        A    I was -- I wasn't identifying people on who

17   was who and who was good and who was bad.  I thought

18   Sandoval was the in-house attorney.  That was my

19   understanding at the West Hills office.  So -- or

20   excuse me -- well, the West Hills Hospital Medical

21   Offices, you know, where the Aluminaid was.  That's

22   where Sandoval was.  And then he started taking --

23   entertaining the doctor to have him go to lunch with

24   Joe Montagnac.  And they had that discussion, the

25   discussions we already talked about.


MAGNA
LEGAL SERVICES

1      Q    So did Mr. Hunt approach you regarding

2    Mr. Sandoval or did you reach out to him?

3      A    I would not have reached out to Mr. Hunt that

4    I can recall.  He would have brought that to us.  We

5    were not in a back and forth type thing.

6      Q    Do you know -- so, when Mr. Hunt approached

7    you, did he say that he knew you were in discussions

8    with Mr. Sandoval about another company?

9      A    Again, apparently so.  I don't -- I just don't

10   recall all the interactions of that how it went down.

11     Q    Did Mr. Hunt say how he knew that you were in

12   discussions with Mr. Sandoval?

13     A    Let me think about that.  Did Mr. Hunt know

14   that I was in discussions with Sandoval; is that the

15   question?

16     Q    Well, that was my last question.

17     A    Again, it would have been directed to the

18   doctor at that point.

19     Q    I understand.  But when I say you, I mean both

20   you and Dr. Grossman.  Did Mr. Hunt indicate to either

21   of you that he knew that you were in discussions with

22   Mr. Sandoval regarding another company?

23     A    I have to be honest with you, I don't really

24   remember that, how it went down.

25     Q    Can you think of any other reason why Mr. Hunt



Page 50

1    would be coming to you with negative information

2    regarding Mr. Sandoval?

3         A    I don't know what would have triggered it

4    actually.  I don't know where the fallout started.  I

5    have no idea what was going on behind the scenes.

6         Q    In any of the discussions that you had with

7    Mr. Sandoval regarding another company, was Mr. Wyles

8    mentioned being involved?

9         A    Was the question was he mentioned or was he

10   involved at the meetings?

11        Q    Well my question was whether there was any

12   discussion of him being involved?

13        A    Let me think.  Hold on one second.  I don't

14   know if he was at that point.

15        Q    Was there any mention of Mr. Wyles in these

16   meetings?

17        A    Somewhere, somehow Mr. -- and I cannot

18   remember who it was that said it to the doctor, and I

19   heard it firsthand that Mr. Wyles was handling the

20   patents for the Aluminaid.  And they were coming up for

21   either renewal or whatever it takes to get them

22   implemented.  And he was somehow going to be able to

23   hold back on that until they expired.  And then they

24   would all get engaged, they would get this company and

25   everybody would be in the United States and have the



Page 51

1    patents cleared.  And something to that effect.  That's

2    what we understood.

3        Q    So you're saying that Mr. Sandoval told you

4    that Mr. Wyles was going to allow the Aluminaid patents

5    to expire?

6        A    I can't say for sure, but I'm almost positive

7    that it was Sandoval that was the one that was speaking

8    those -- again, it was like a discussion that I was

9    just lightly paying attention to.  But at the end of

10   the day -- go ahead.

11       Q    Go ahead.  Finish your answer.

12       A    That was the understanding that we had from

13   the discussions, from Sandoval and Montagnac.

14       Q    So it was either Mr. Sandoval or Mr. Montagnac

15   who said that Mr. Wyles intended to allow the patents

16   to expire?

17       A    And I'm going to throw in another figure.

18   There was a gentleman that was a friend of -- or

19   so-called friend of Dr. Grossman named Peter Antico.

20   And he was also feeding information like that to the

21   doctor when I wasn't around.  The doctor was relating

22   that to me.

23       Q    So Dr. Grossman told you that Peter Antico was

24   saying that Mr. Wyles was going to let the patents

25   expire?



Page 52

 1      A    I'm just saying that through those three guys,

 2   that was the message getting across to us, specifically

 3   to the doctor.

 4      Q    And I'm just wondering if there's -- can you

 5   still hear me?  I've got a weird beep.

 6           MR. SCULLY:  We're here.

 7           MR. IRELAND:  We're here.

 8   BY MR. VENTOLA:

 9      Q    Okay.  You're saying that somebody told you

10   that Mr. Wyles intended to let the Aluminaid patents

11   expire?

12      A    That is correct.  That's how I remember it.

13      Q    But you don't know who that?

14      A    It was one of those three.

15      Q    So either Mr. Antico, Mr. Montagnac, or

16   Mr. Sandoval?

17      A    Correct.  If I remember correctly.  I just

18   don't remember all the players, but if I had to guess,

19   it would have been one of those three.

20      Q    Was Mr. Antico present at any of the meetings

21   that you described with Mr. Sandoval regarding another

22   company?

23      A    I don't recall him, but there is a chance that

24   he was at one of them.  I don't remember.  It was too

25   long ago.



Page 53

1      Q     Did anybody else give you any information that
2  Mr. Wyles was intending to allow patents to expire?
3      A     I don't think so.  That's where I heard it, at
4  the restaurant.
5      Q     Did you do anything to find out whether that
6  was true?
7      A     I heard it at the restaurant.  I heard it
8  firsthand.
9      Q     Well, did you do anything to find out whether
10 what you heard at the restaurant was true?
11     A     Well, it wouldn't have been my place to do
12 that.  However, I can tell you this:  Peter Antico did
13 in fact call me when I asked what was going on and he
14 said to call Mr. Wyles because something big was
15 happening very soon.
16     Q     So why did Mr. Antico say you should call
17 Mr. Wyles?
18     A     Because we were trying to figure out what all
19 this was about.  And we were trying to figure out who
20 was who and what was what.  And Peter Antico said, You
21 need to call Mr. Wyles.  He'll be able to clear it up
22 for you with what's going on.
23     Q     What else did Mr. Antico say?
24     A     Well, he was very elevated and frustrated that
25 that the company wasn't going forward smoothly.  It was



Page 54

1    all coming apart.  And he was kind of anxious that the

2    doctor engaged with this new idea of some kind of a

3    corporate stockholder takeover.

4         Q    Mr. Antico said that he was upset that

5    Dr. Grossman was considering a stockholder takeover?

6         A    He was just saying that we needed to talk to

7    Mr. Wyles as soon as possible to get a clear picture of

8    what was being done to get Aluminaid back in on a

9    distribution plan.

10        Q    So, he didn't say you should be talking to

11   Mr. Wyles about any kind of plans to subvert Aluminaid

12   or take its patents or have it taken over by

13   shareholders?

14        A    Mr. Antico just said -- he called the doctor,

15   and then he called me.  And he said we were -- I just

16   said we're trying to clarify who's who.  And he said

17   that you just need to call Mr. Wyles right away.

18        Q    And you did call Mr. Wyles right away?

19        A    I did.

20        Q    And you've received a tape of that phone call,

21   correct?

22        A    Yes.

23        Q    Is that tape an accurate description of that

24   phone call?

25        A    Well, I received a tape -- I received what was



Page 55

1    I believe the tape of the phone call.

2        Q    You don't know of any inaccuracies of that

3    tape of that phone call, correct?

4        A    I'm not aware, no, I don't.

5        Q    So, other than the possible statements from

6    Mr. Sandoval and -- or Mr. Montagnac, or Mr. Antico

7    what other information did you receive regarding

8    Mr. Wyles' participation in any plan to ship to another

9    company or allowing patents to expire?

10       A    Okay.  Now we probably should get back to the

11   deposition at hand with Mr. Hunt, because we're getting

12   far from that.

13       Q    So you're refusing to answer the question?

14       A    Yes.

15       Q    In what ways did the discussions that you've

16   been willing to testify about so far relate to Mr. Hunt

17   that the discussions I just asked you about don't?

18       A    Did you hear the last part?

19            I'm sorry, I didn't hear the last part.

20       Q    In what way were the discussions that you've

21   been testifying about related to Mr. Hunt that the

22   discussions you're now refusing to answer about are

23   not?

24       A    I don't know.  I don't understand that

25   question.



Page 56

1          MR. SCULLY:  Why did you change your mind

2      about what you're willing to talk about?

3          MR. IRELAND:  Objection, mischaracterizes

4      testimony, Counsel.  Sorry.  He's not my witness, but

5      double teaming a pro se seems a little bit

6      inappropriate.

7          MR. VENTOLA:  You can answer.

8          MR. IRELAND:  I'm not instructing him not to

9      answer.  I can't do that.

10         Go ahead.

11         MR. SCULLY:  No, you can't do that.  Let's

12     just have Mr. Ventola ask the question again.  It's a

13     little complicated, so we'll just let him ask it again.

14     BY MR. VENTOLA:

15     Q    Why were you willing to talk about the

16     conversations with Mr. Sandoval and others that you've

17     been talking about so far, but are not willing to

18     answer any further questions about them or about other

19     discussions?

20     A    I'm not real happy about talking about any of

21     the discussions with Sandoval or anybody that doesn't

22     have to do with Mr. Hunt.  But I am trying to get you

23     guys through this thing to the best of my ability so

24     that we can get through this deposition as it pertains

25     to Mr. Hunt.



1          At this point we're no -- the last five, ten

2     questions haven't had anything to do with Mr. Hunt.

3     The deposition is described to be done as it pertains

4     to Mr. Hunt.  I don't know giving you as much

5     information as I can to clarify Mr. Hunt's situation,

6     but now we're way off that.  I want to go back to that.

7          Q    Well, you've been testifying about things that

8     you learned about Mr. Wyles and it seems like you're

9     only willing to give partial testimony.  And so, I want

10    to know why you're cutting -- you're considering my

11    last question to be not enough about Mr. Hunt, whereas

12    earlier questions were permissible?

13         A    The previous questions that I was answering

14    were intended to clarify your original question about

15    Mr. Hunt as it pertained to how we got the information

16    about Sandoval.

17         What I'm trying to tell you now is, we're

18    drifting away from that and we're getting into the crux

19    of the matter that should have been deposed a long time

20    ago.  Let's get back to how Mr. Hunt is involved is my

21    point.

22         Q    Well, I'm going to ask you again for the

23    record, other than the discussions you've told me

24    about, what discussions have you had with anyone

25    regarding Mr. Wyles' participation in an idea to shift



1    to a different company or allow patents to expire or

2    have the company taken over by shareholders?

3         A    Okay.  None of that -- I haven't had -- none

4    of that is as it pertains to Mr. Hunt.

5         Q    So, are you refusing to answer the question?

6         A    No.  I'm saying it doesn't pertain to Mr. Hunt

7    in any way.

8         Q    Are you refusing to answer the question?

9         A    Yes.

10        Q    And did you have any other discussions with

11   Mr. Hunt regarding Mr. Wyles?

12        A    I do not recall.

13        Q    Have you ever discussed Mr. Hunt with

14   Mr. Wyles -- I'm sorry, Mr. Wyles with Mr. Hunt?

15        A    Have I ever discussed Mr. Wyles with Mr. Hunt?

16   In what capacity?

17        Q    In any capacity.

18        A    Just that -- well, let me think.  I really

19   don't recall anything specific.

20        Q    Do you recall anything generally?

21        A    I'm trying to think.  I can't think -- no, I

22   can't.

23        Q    Have you ever had any written communication

24   with Mr. Hunt about Mr. Wyles?

25        A    I may have in passing.  I don't know.  If so,



Page 59

1    it would have been involving the case itself after a

2    lawsuit was filed.  But as far as the business, not

3    really.

4         Q    What discussions did you have with him about

5    the lawsuit?

6         A    I just -- the only thing I remember is that

7    somebody, possibly Mr. Hunt, said that Mr. Wyles was

8    suing Carl Freer.

9         Q    So this was about a lawsuit by Mr. Wyles

10   against Carl Freer rather than a suit by Aluminaid

11   against Mr. Wyles?

12        A    I really didn't know the ins and outs of it at

13   the time, no.

14        Q    When did you have this discussion with

15   Mr. Hunt?

16        A    I couldn't even tell you specifically -- I

17   couldn't even tell you if I actually did.  I'm just

18   saying, my understanding was whether it came from

19   Mr. Hunt or somebody else that Mr. Wyles was suing Carl

20   Freer.

21        Q    Are you aware of an Aluminaid-related company

22   suing Mr. Wyles?

23        A    Well, I've come to be aware of it since I've

24   been involved in this lawsuit.

25        Q    When did you become aware of it?



Page 60

1        A    When I was served back in 2017 in Colorado,

2    from the Colorado case.

3        Q    So, your -- what was your understanding of the

4    case that you gave a declaration in?

5        A    I didn't really have an understanding of the

6    case at the time when I did my declaration.  I was just

7    asked to come in and give a declaration.

8        Q    Who asked you to do that?

9        A    Somewhere someone on the side of Aluminaid and

10   it would have been Lobe and Lobe, but I couldn't tell

11   you exactly who it was in Lobe and Lobe because that's

12   where I did the deposition.

13       Q    What did they tell you about giving a

14   declaration?

15       A    They said that Mr. Wyles was suing Carl Freer

16   and they wanted a declaration on my perspective of

17   everything.

18       Q    Did they indicate to you that they heard from

19   somebody else what information you would be able to

20   give?

21       A    I do not understand that question at all.

22       Q    What discussions did you have with them about

23   what information you'd be willing to give or able to

24   give?

25       A    I was just driving down the street one day and



Page 61

1    they said, hey, listen, we are being sued by Mr. Wyles

2    and we need -- if you're willing to come in and give a

3    declaration, which I did.  I said I would.

4         Q    So in that first conversation, what did they

5    say they wanted a declaration to be about?

6         A    They didn't say what it was going to be about.

7    They just asked me to come in and so I went in.

8         Q    So you went in that day?

9         A    I don't remember if it was exactly that day.

10        Q    So what did they tell you when you met?

11        A    They just said -- I went into an office and

12   they said these are the people here for this and the

13   case, put me under oath and asked me questions.

14        Q    So they asked you questions orally?

15        A    Yes.

16        Q    And somebody was recording it?

17        A    I guess.

18        Q    Was there a court reporter there or was it a

19   tape recorder?

20        A    I do not remember exactly.

21        Q    Have you ever seen the recording of what was

22   written?

23        A    The recording itself?  No.

24        Q    Or the transcript?

25        A    Not that I remember, no.  They just said after



Page 62

1    the deposition -- after the declaration that they would

2    put it together and get me a copy of it.

3        Q    So, you never saw an actual transcript of the

4    statement that you gave, but they wrote up a statement?

5        A    Well, what they ended up doing is writing the

6    declaration out and then asked if it was accurate.

7        Q    So again, what you saw didn't include a

8    transcript of the questions and answers; it was a

9    declaration, a statement that they wanted you to give,

10   right?

11       A    That's what I remember, yes.

12       Q    So did you have any e-mail communication or

13   written communication regarding a draft of a document?

14       A    I don't recall how that transpired.

15       Q    Did you make any changes to the document after

16   they drafted it?

17       A    See, I don't remember that either.  I thought

18   that I did actually, but I don't remember what they

19   were.

20       Q    Would you have made changes sitting there in

21   their office or would you have sent changes to them?

22       A    I don't remember.  Again, I've got to be

23   honest with you, for me to proceed, I want to get to

24   the Mr. Hunt stuff.  This has nothing to do with

25   Mr. Hunt that I can see.



Page 63

1    Q    Are you refusing to answer the question?

2    A    Yes.

3    Q    Did you review the statement they gave you for

4    accuracy?

5    A    Outside the scope.

6    Q    Are you refusing to answer?

7    A    Yes.

8    Q    Was the statement accurate?

9    A    Which statement?

10   Q    The statement that you signed for Lobe and

11   Lobe in their office.

12   A    Well yes, it is accurate.  To the best of my

13   knowledge, it's absolutely accurate?

14   Q    So you checked for accuracy at the time?

15   A    I did.

16   Q    You still believe that everything in Exhibit 2

17   is accurate?

18   A    Yes.

19   Q    Exhibit 2 states that Mr. Wyles called you,

20   correct?

21   A    Okay.  I've already put an amended declaration

22   to this.

23   Q    You've amended Exhibit 2?

24   A    I have.

25   Q    When did you amend Exhibit 2?



Page 64

1          A    I do not remember -- oh well, I did it for the

2     Colorado case.

3          Q    Okay.  But Exhibit 2 is filed in the

4     California case, correct?

5          A    I would assume.

6          Q    So did you ever amend Exhibit 2?

7               MR. SCULLY:  I'm sorry, can you repeat the

8     question?

9     BY MR. VENTOLA:

10         Q    Did you ever amend Exhibit 2?

11         A    I already stated that I did.

12         Q    Did you ever submit any amendments to Exhibit

13    2 in the California action where Exhibit 2 was filed?

14         A    I do not know.

15         Q    So I'll ask you again is Exhibit 2 accurate?

16         A    Exhibit 2 is accurate as long as you include

17    the amended amendment to it, yes.

18         Q    Did you understand Exhibit 2 as it is to have

19    been accurate at the time that you signed it?

20         A    Okay.  Listen, these questions are all way

21    beyond the scope now.  Let's get back to Mr. Hunt.

22    This has nothing to do with Mr. Hunt.  If you're trying

23    to attack my credibility, then that's a whole different

24    scope of discovery, sorry.

25         Q    Are you refusing to answer?



Page 65

```
 1          A    Yes.

 2          Q    Did you go to Singapore on behalf of any of

 3    the Aluminaid companies?

 4          A    Outside the scope.

 5          Q    Are you refusing to answer?

 6          A    Yes.

 7          Q    Did Mr. Marten accompany you to Singapore or

 8    any of the --

 9          A    Who?

10          Q    -- Aluminaid companies?

11          A    You've got to repeat it.  I didn't hear

12    what -- who you were talking about.

13          Q    Did you meet with Mr. Hunt or Mr. Marten when

14    going to Singapore on behalf of the Aluminaid

15    companies?

16          A    I did meet with Mr. Hunt.  Mr. Marten is

17    outside the scope of the discovery.

18          Q    When did you meet with Mr. Hunt in Singapore?

19          A    I do not remember.

20          Q    He was there on behalf of the Aluminaid

21    companies?

22          A    I do not know.

23          Q    Were you there on behalf of the Aluminaid

24    companies?

25          A    No.
```



Page 66

1       Q     What was your purpose for meeting with

2   Mr. Hunt?

3       A     Mr. Hunt was like a meet and greet guy.  He

4   was like a valet.

5       Q     A valet?

6       A     Well, he's the one who I met with and he was

7   the one taking me back to the Aluminaid offices.

8       Q     So, Mr. Hunt was apparently acting on behalf

9   of Aluminaid there in Singapore as being a

10  spokesperson?

11      A     The only level of his involvement with

12  Aluminaid at that time was he was in Singapore.

13  Whether he was with the company at that point or not, I

14  have no idea.

15      Q     So what was your role when Mr. Hunt met with

16  you in Singapore?

17      A     What was my role as far as what?

18      Q     In what capacity were you acting when Mr. Hunt

19  was meeting with you in Singapore?

20      A     Well, I was there at the bequest of --

21  Dr. Grossman had asked -- he had been asked to come out

22  to Singapore.  And he -- his wife Elizabeth did not

23  think he was fit to make that trip.  So it was agreed

24  that I would go out and see, again, who was who in the

25  companies, whether Carl Freer was legitimate or whether



Page 67

1    the Wyles Sandoval Montagnac group was credible.

2        Q    So you're saying you went to Singapore as a

3    representative of Dr. Grossman?

4        A    Myself?  Yes.

5        Q    So, as you were in Singapore, did you ever act

6    on behalf of the Aluminaid companies?

7        A    No.

8        Q    How many times were you in Singapore?

9        A    I was -- well, I was in Singapore for that one

10   time and then I went to a followup trip later on.

11       Q    In either of the trips, did you also go to

12   Malaysia?

13       A    Well, let's get back to Mr. Hunt.

14       Q    Well, I'm just trying to establish what your

15   role and Mr. Hunt's role was on these trips to

16   Singapore or Malaysia?

17       A    Okay.  Well, as far as my role, you missed out

18   on that.  If you want to ask about Mr. Hunt, I'll be

19   more than happy to answer.

20       Q    So, are you refusing to tell me what role if

21   you were acting in any role with any Aluminaid

22   companies when you went to Singapore and saw Mr. Hunt?

23       A    I am.

24       Q    And are you refusing to -- so, on this later

25   trip to Singapore or Malaysia, did you meet with


MAGNA
LEGAL SERVICES

Page 68

1    Mr. Hunt again?

2         A    That, I can't remember.  I do not know if he

3    was there or not.

4         Q    Were you acting on behalf of Aluminaid in that

5    trip?

6         A    I was not.

7         Q    Were you again acting on behalf of

8    Dr. Grossman?

9         A    I was.

10        Q    Did you do anything while in Singapore on

11   either trip on behalf of Aluminaid?

12        A    Outside the scope.

13        Q    Are you refusing to answer?

14        A    Yes.

15        Q    Did you make any public appearances on either

16   of these trips?

17        A    Outside the scope of discovery.

18        Q    Are you refusing to answer?

19        A    Yes.

20        Q    Did Aluminaid compensate you for either trip

21   to Singapore or Malaysia?

22        A    Outside the scope of discovery.

23        Q    Are you refusing to answer?

24        A    Yes.

25        Q    What have your discussions been about this



Page 69

1    case with Mr. Ireland?

2         A    That's way outside the scope of discovery.

3         Q    Well, I'm entitled to ask you about

4    discussions you may have had with him regarding this

5    deposition or the case.

6         A    I refuse to answer.

7         Q    Does Mr. Ireland represent you?

8         A    No.

9         Q    Have you had any discussions with Mr. Ireland

10   about Mr. Hunt?

11        A    I have.

12        Q    What discussions have you had with Mr. Ireland

13   about Mr. Hunt?

14        A    That I was -- well, just that I had a

15   deposition.

16        Q    Did you discuss with Mr. Ireland what

17   questions you should or should not answer in this

18   deposition?

19        A    No, not at all.

20        Q    Did you discuss with Mr. Ireland about

21   what you knew about Mr. Hunt?

22        A    No.

23        Q    Did Mr. Ireland tell you anything about

24   Mr. Hunt?

25        A    No.



Page 70

1        Q    Did he discuss with you Mr. Hunt's deposition

2   testimony?

3        A    No.

4             MR. VENTOLA:   Subject to the objections that

5   were made and the refusals to answer, which were

6   improper, and are going to have to be addressed by the

7   court, I don't have any other questions at this time.

8             MR. SCULLY:   Well, I was going to suggest that

9   we finish things with the exhibits.   So, there was this

10  one exhibit that we took from your pile that was two

11  pages.   And I think we should assign that a number,

12  correct?

13            Can we go off the record for a moment to do

14  that?

15            MR. IRELAND:   It shouldn't be that hard.

16            MR. VENTOLA:   Sure.

17            MR. IRELAND:   I think we can stay on the

18  record and do it, just plaintiff's next in order.

19  What's next in order, 4?

20            THE REPORTER:   Three.

21            MR. VENTOLA:   I mean, all the exhibits I mean,

22  if it's not too big should be marked as a deposition

23  exhibit, everything that was produced today.

24            MR. SCULLY:   Yeah.   So, let me have that file

25  with other papers that you brought with you to the



Page 71

```
1    deposition and we'll mark that as exhibit next number,

2    which is four I think.

3              THE WITNESS:  What are you looking for?

4              MR. SCULLY:  The papers that you brought with

5    you today to the deposition.

6              THE WITNESS:  What about them?

7              MR. SCULLY:  We're going to mark them as

8    Exhibit 4.

9              THE WITNESS:  You're talking about this here?

10             MR. SCULLY:  No, I mean the folder that you

11   have with those other papers.

12             THE WITNESS:  No.  I'm not --

13   BY MR. VENTOLA:

14       Q    But you brought them with you to the

15   deposition.

16       A    So, I brought my glasses.  You want those too?

17   You're not going to get the folder.  Knock it off.

18             MR. SCULLY:  Why not?

19             THE WITNESS:  It is my own personal papers.

20             MR. VENTOLA:  Well, I'm going to state for the

21   record that you were reviewing those papers for the

22   purposes of answering questions during the deposition.

23   They apparently have not been produced, even though

24   they apparently pertain to this case, if they were

25   reviewed for the purposes of answering deposition
```



Page 72

1    questions.  And therefor, they should be produced and

2    distributed to everybody as deposition exhibits.

3            THE WITNESS:  Okay.  Well, all of the papers I

4    reviewed are already exhibits.  The business plan --

5            MR. VENTOLA:  The folder that you --

6            THE WITNESS:  No.  No.  No.  Exhibit 1,

7    Exhibit 2, what's soon to be Exhibit 3 are the only

8    papers that I reviewed to answer your questions.

9    BY MR. VENTOLA:

10       Q    What are the other papers you have with you?

11   Why did you bring them?

12       A    They were like the notice on how to get here,

13   the directions.

14           MR. SCULLY:  That's generally included as an

15   exhibit.

16           THE WITNESS:  Well, that I can give you.  You

17   can have that --

18           MR. VENTOLA:  You're --

19           MR. SCULLY:  One person at a time has to talk.

20           THE WITNESS:  Okay.  No problem on that one.

21           MR. VENTOLA:  So your papers aren't going to

22   be taken from you.  They're going to be copied.  You'll

23   get your papers back.

24           THE WITNESS:  You already have them.

25           MR. IRELAND:  Mr. Brady, I'm not your lawyer



Page 73

1    in any way.  Would you let Mr. Scully go through the

2    documents you have and read into the record what the

3    documents are, so it will be clear what you have here

4    that's not marked as an exhibit?  And if there's any

5    specific document that then people want to discuss,

6    whether they can get a copy, we'll know what it is?

7              MR. SCULLY:  That's fair enough.

8              THE WITNESS:  Yes, that is fair enough.

9              MR. IRELAND:  Okay.  Why don't you hand the

10   folder then, put it on the table.  Mr. Scully can look

11   at it and hopefully we can get through this fairly

12   quickly.

13             THE WITNESS:  So, I'm going to go get it.

14             MR. IRELAND:  Isn't the folder here?

15             THE WITNESS:  No, it's in my car.

16             MR. SCULLY:  You walked back and put it in

17   your car?

18             THE WITNESS:  When I went out to get my

19   glasses.

20             MR. IRELAND:  Oh, well I propose we take a

21   break then while you get your folder.

22             THE WITNESS:  Okay.

23             MR. SCULLY:  Yes.  We'll take a brief break to

24   give you enough time to get the folder.

25             THE WITNESS:  Okay.


MAGNA ►
LEGAL SERVICES

Page 74

1        MR. VENTOLA:  All right.

2        (Deposition Exhibit 3 was marked for

3        identification by the Court Reporter and is

4        attached hereto.)

5        (Recess.)

6        MR. SCULLY:  All right.  So, I've reviewed the

7   documents in the folder that Thomas Brady brought and

8   there aren't any that I want to ask questions about.

9   Most of them being documents that either I've

10  propounded myself or that -- or otherwise filed in the

11  court.

12       Was there anything that you wanted to ask

13  about, Mr. Ireland?

14       MR. IRELAND:  No.  And that was my -- I looked

15  over your shoulder.  It all looked like filed documents

16  of one kind or another, so.

17       MR. SCULLY:  So, I don't have any questions

18  about these papers.

19       THE WITNESS:  Okay.  Thank you.

20       MR. IRELAND:  I think we're done.

21       MR. VENTOLA:  Thank you.

22       Thank you, Mr. Brady.

23       THE REPORTER:  Mr. Ireland, would you like a

24  copy of this?

25       MR. IRELAND:  Yes, please.



Page 75

1

2                    The deposition proceedings

3                    were concluded at 3:50 P.M.

4                              -o0o-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 76

1                        REPORTER'S CERTIFICATION

2

3        I, Deidre Young, a Certified Shorthand Reporter in

4    and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7    that the deposition was then taken before me at the

8    time and place herein set forth; that the testimony and

9    proceedings were reported stenographically by me to the

10   best of my ability and later transcribed into

11   typewriting under my direction; that the foregoing is a

12   true record of the testimony and proceedings taken at

13   that time.

14

15       IN WITNESS WHEREOF, I have subscribed my name this

16   17th day of FEBRUARY, 2020.

17

18

19

20   _____

21       Deidre Young, CSR No. 11461

22

23

24

25



Page 77

1                    DEPOSITION ERRATA SHEET

2

3

4    Our Assignment No.  553115

5    Case Caption:  TERRENCE M. WYLES

6    vs. ALLEN ZACHARY SUSSMAN, et al.,

7

8              DECLARATION UNDER PENALTY OF PERJURY

9

10          I declare under penalty of perjury that I have

11   read the entire transcript of my Deposition taken in

12   the above captioned matter or the same has been read to

13   me, and the same is true and accurate, save and except

14   for changes and/or corrections, if any, as indicated by

15   me on the DEPOSITION ERRATA SHEET hereof, with the

16   understanding that I offer these changes as if still

17   under oath.

18       Signed on the _____ day of _____,

19   20___,

20

21   _____

22              THOMAS BRADY

23

24

25



Page 78

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change: _____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change: _____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change: _____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change: _____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change: _____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change: _____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change: _____

23

24     SIGNATURE:_____DATE_____

25              THOMAS BRADY



Page 79

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change: _____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change: _____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change: _____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change: _____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change: _____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change: _____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change: _____

23

24     SIGNATURE:_____DATE_____

25              THOMAS BRADY



**A**

**ability** 56:23 76:10
**able** 50:22 53:21 60:19,23
**absolutely** 21:17 28:18 63:13
**access** 35:13 38:4
**accompany** 65:7
**account** 35:11,14 35:16
**accounts** 35:19,22 35:24
**accuracy** 63:4,14
**accurate** 16:24 17:5 54:23 62:6 63:8,12,13,17 64:15,16,19 77:13
**accurately** 18:24 22:4 28:5 43:1
**act** 67:5
**acting** 4:4 12:15 66:8,18 67:21 68:4,7
**action** 26:13 64:13
**active** 36:8
**actual** 10:21,25 62:3
**address** 35:5,7 37:25 38:5,20 41:10
**addressed** 70:6
**administered** 5:7
**advisory** 11:17 14:1,3,12
**affidavit** 14:17,23 15:12 19:6
**affidavits** 45:15
**affiliated** 7:20 8:8 8:10 24:4,13,18 24:24 25:3,4,6 36:20
**ago** 6:1,17,19 19:2 34:22 36:6,13 38:2 52:25 57:20
**agreed** 66:23

**agreement** 4:9 27:10,19
**agreements** 28:11
**ahead** 34:9 35:8 46:14,15 51:10,11 56:10
**al** 1:8 77:6
**ALLEN** 1:8 77:6
**allow** 51:4,15 53:2 58:1
**allowed** 28:15 32:5
**allowing** 55:9
**alternative** 46:24
**Aluminaid** 4:4 7:21 7:21 8:9,17 10:16 11:2,8,23 12:15 12:24 13:9,11 14:4,7,13 17:11 22:23 23:5,5,6,6 23:19,20,22,24 35:23 36:18,20,23 37:3,13,19,20,22 37:24 40:6,13,23 41:1,21 42:3 46:24 48:21 50:20 51:4 52:10 54:8 54:11 59:10 60:9 65:3,10,14,20,23 66:7,9,12 67:6,21 68:4,11,20
**Aluminaid-related** 59:21
**amend** 63:25 64:6 64:10
**amended** 63:21,23 64:17
**amendment** 64:17
**amendments** 64:12
**and/or** 77:14
**ANGELES** 2:6
**answer** 3:14 7:3,4,8 7:9,14 8:1,2,3 9:11,20,21,24 10:1,2,4,5,5,6,9 10:13,19 11:4,10 11:15,20,24 13:15

13:21,22 14:5,9 14:15 15:14,19,24 16:14 17:2,8 18:24 24:7,21 25:5,22 26:6,8 27:7,12 28:5,16 28:19,21 29:12 30:5,7,19 31:1,9 31:23,25 32:7,11 32:17 43:13 47:6 51:11 55:13,22 56:7,9,18 58:5,8 63:1,6 64:25 65:5 67:19 68:13,18,23 69:6,17 70:5 72:8
**answering** 57:13 71:22,25
**answers** 7:5 42:1 62:8
**Antico** 51:19,23 52:15,20 53:12,16 53:20,23 54:4,14 55:6
**anxious** 54:1
**anybody** 14:11 53:1 56:21
**apart** 54:1
**apparently** 49:9 66:8 71:23,24
**appearances** 2:1 68:15
**appears** 34:5
**applications** 9:7 20:1 47:19
**approach** 47:1,13 47:14 49:1
**approached** 8:15 49:6
**Approximately** 21:12
**Asia** 42:9
**asked** 6:5 8:16 9:15 15:16 25:24 28:21 32:23 39:17 53:13 55:17 60:7,8 61:7 61:13,14 62:6

66:21,21
**asking** 6:16 15:21 16:1,3 21:13 25:1 25:2 26:4 30:14 41:25
**assign** 70:11
**Assignment** 77:4
**assistance** 33:16
**associated** 17:16 18:4,6 22:24 23:2 23:14,18,21
**association** 17:19
**assume** 64:5
**assure** 21:25
**attached** 12:10 15:8 74:4
**attack** 64:23
**attend** 8:16
**attendance** 20:13
**attended** 20:16
**attending** 22:14
**attention** 23:23 51:9
**attorney** 2:10 33:20 33:24 36:8 48:18
**attorneys** 6:13
**audible** 7:5
**AVENUE** 1:18
**aware** 13:4,8,10 14:11 23:4 25:7,8 25:10 28:13 29:14 29:16 30:23 55:4 59:21,23,25

**B**

**back** 8:12 42:4,10 43:11 49:5 50:23 54:8 55:10 57:6 57:20 60:1 64:21 66:7 67:13 72:23 73:16
**background** 8:6 9:13
**bad** 42:8 48:17
**bandage** 20:2,25 40:22

**bandages** 19:19
**banished** 42:9
**based** 28:17,17,23 29:13 30:20 31:24 32:2,8
**basically** 41:9 45:15
**beep** 52:5
**behalf** 65:2,14,20 65:23 66:8 67:6 68:4,7,11
**believe** 6:11 8:12 18:1 19:17 23:2 24:23 25:5 35:21 36:1 40:11 55:1 63:16
**bequest** 66:20
**best** 20:2 45:24 56:23 63:12 76:10
**better** 46:12
**beyond** 23:8,16 45:4 64:21
**big** 45:10 53:14 70:22
**bit** 56:5
**Blu** 25:16,19,25 26:5 29:5,8,10,15 29:21 30:4 32:4 32:14 39:20 40:17 40:20 41:4,5 46:19,20
**board** 11:13,17 14:1,4,13
**BONESTEEL** 2:4
**bottom** 13:1
**BOULEVARD** 2:11
**Brady** 1:14 3:3 4:6 5:1,6,12,14 12:12 15:4 34:12 72:25 74:7,22 77:22 78:25 79:25
**break** 32:18,19 46:1,3 73:21,23
**bred** 41:5
**brief** 73:23



**bring** 72:11
**brought** 44:24 45:5
    47:17 49:4 70:25
    71:4,14,16 74:7
**BROWN** 2:4
**burn** 4:4 9:7 12:15
    19:19
**business** 12:6,7
    35:23 40:23 42:8
    59:2 72:4

**C**
**California** 1:2,18
    2:6,11 14:19,25
    19:10,11 22:12
    23:25 26:13,18
    36:9 39:2,6 64:4
    64:13 76:4
**call** 12:3 53:13,14
    53:16,21 54:17,18
    54:20,24 55:1,3
**called** 8:17 23:18
    25:15,18,25 26:5
    28:14 29:5 37:18
    37:24 38:15 54:14
    54:15 63:19
**capacity** 17:13,15
    58:16,17 66:18
**Caption** 77:5
**captioned** 77:12
**car** 73:15,17
**Carl** 8:20 9:6 18:14
    19:17 42:3,8 59:8
    59:10,19 60:15
    66:25
**case** 1:4 24:1 26:19
    33:21 39:2,7
    44:16,19,21 59:1
    60:2,4,6 61:13
    64:2,4 69:1,5
    71:24 77:5
**cases** 45:16
**CCP** 4:8
**CENTRAL** 1:2
**certain** 16:16 20:13
    32:9 35:5

**CERTIFICATI...**
    76:1
**Certified** 76:3
**certify** 76:4
**chance** 52:23
**change** 56:1 78:2,4
    78:5,7,8,10,11,13
    78:14,16,17,19,20
    78:22 79:2,4,5,7,8
    79:10,11,13,14,16
    79:17,19,20,22
**changed** 23:10
**changes** 62:15,20
    62:21 77:14,16
**check** 35:16 43:23
**checked** 63:14
**CITY** 2:11
**clarify** 7:18 26:3
    29:19 54:16 57:5
    57:14
**clear** 26:16 47:16
    53:21 54:7 73:3
**cleared** 51:1
**closely** 43:21
**closer** 22:3
**Colorado** 2:17 60:1
    60:2 64:2
**come** 9:6 18:9
    32:15 39:3,7 40:4
    40:8,12,20 41:1
    41:10 42:10 48:8
    59:23 60:7 61:2,7
    66:21
**coming** 42:1,4 50:1
    50:20 54:1
**communication**
    35:20 58:23 62:12
    62:13
**companies** 8:9
    10:17 11:8,12,18
    17:11 22:23 23:10
    65:3,10,15,21,24
    66:25 67:6,22
**company** 8:7,17
    9:14 10:21,25
    11:2,6 17:13,17

17:19 18:5,7
    20:13 22:25 23:1
    23:2,4,14,17,18
    23:21 24:4,13,18
    24:25 25:3,6,15
    25:18,25 26:5
    29:5 37:11,15,18
    37:23 38:15 40:4
    40:7,16 46:13,24
    47:18 49:8,22
    50:7,24 52:22
    53:25 55:9 58:1,2
    59:21 66:13
**compensate** 68:20
**completely** 7:9
    14:22
**complicated** 56:13
**compound** 37:8,13
**computer** 35:1,2
**concern** 34:15,17
    34:20
**concerning** 31:4
**concluded** 75:3
**confidentiality** 4:9
**connection** 35:23
**considering** 54:5
    57:10
**consultant** 13:2
**contact** 20:11
**context** 46:22
**contract** 10:16
**conversation** 7:8
    9:17 61:4
**conversations**
    56:16
**copied** 31:15 72:22
**copies** 34:24 45:21
**copy** 25:13,13 45:2
    45:9,17,24 62:2
    73:6 74:24
**corporate** 54:3
**correct** 7:22 30:4,9
    34:3 38:22 41:22
    46:25 52:12,17
    54:21 55:3 63:20
    64:4 70:12

**corrections** 77:14
**correctly** 52:17
**Counsel** 2:1 21:13
    27:17 34:8 56:4
**country** 43:18
**couple** 22:11
**court** 1:1 5:7 7:3,11
    12:9 14:19,25
    15:7 24:1 26:13
    26:19 28:18 39:2
    45:2,16,21 61:18
    70:7 74:3,11
**court's** 28:20 29:13
    30:20 31:24 32:2
    32:8
**credibility** 64:23
**credible** 67:1
**crux** 57:18
**CSR** 1:21 76:21
**CULVER** 2:17
**cutting** 57:10

**D**
**Dane** 25:16,19,25
    26:5 29:5,8,10,15
    29:22 30:4 32:4
    32:14 39:21 40:17
    40:20 41:4,5
    46:19,21
**date** 19:8 43:21
    78:24 79:24
**day** 51:10 60:25
    61:8,9 76:16
    77:18
**December** 27:9,24
    28:3
**decided** 20:3
**declaration** 4:5 6:3
    15:4 23:25 24:9
    24:15 26:11,18
    32:4,14 39:1,6,16
    39:24,25 60:4,6,7
    60:14,16 61:3,5
    62:1,6,9 63:21
    77:8
**declare** 77:10

**DEFENDANT** 2:3
**Defendant's** 4:7
**Defendant(s)** 1:9
**Define** 8:10
**defined** 10:7
**degree** 18:5,7 22:25
**Deidre** 1:21 76:3,21
**delete** 35:10
**DENVER** 2:17
**department** 36:9
    47:19
**deposed** 57:19
**deposition** 1:14 5:1
    5:15,19,23 6:3,4,7
    6:9,10,23 7:24 8:4
    11:9,14 12:3,8
    13:7,14,19 15:2,6
    15:13,16,18 17:1
    17:7 18:11 24:6
    25:7,8,13,21 26:7
    29:15,24 32:6,25
    33:7 34:1,5 43:14
    45:6 55:11 56:24
    57:3 60:12 62:1
    69:5,15,18 70:1
    70:22 71:1,5,15
    71:22,25 72:2
    74:2 75:2 76:7
    77:1,11,15 78:1
    79:1
**depositions** 6:24
**described** 40:9
    52:21 57:3
**description** 4:3
    54:23
**developed** 41:12
**Development** 4:6
    14:18,24 23:11,15
    24:2,11,16
**difference** 6:11
**different** 20:14
    29:3 58:1 64:23
**directed** 47:12,17
    49:17
**direction** 29:13
    32:8 76:11



**directions** 72:13
**disbarred** 47:9
**discipline** 36:8
**disclosed** 34:2
**discovery** 9:20,23
  10:7,18 11:3,19
  11:25 13:6,13,18
  14:8,14 15:1,17
  15:23 16:13,25
  17:6 24:5,20
  25:20 27:6,11
  28:15 29:6,11
  30:13,20 31:8,22
  32:5,10,16 64:24
  65:17 68:17,22
  69:2
**discuss** 8:25 9:1
  26:10,17 27:18
  47:20 69:16,20
  70:1 73:5
**discussed** 9:2 19:19
  20:6,9 21:2,5,7
  29:15,21 30:4,6,8
  32:4 47:1,4 58:13
  58:15
**discussion** 29:2
  36:10,14 46:10,16
  46:23 48:24 50:12
  51:8 59:14
**discussions** 46:7
  47:4 48:5,25 49:7
  49:12,14,21 50:6
  51:13 55:15,17,20
  55:22 56:19,21
  57:23,24 58:10
  59:4 60:22 68:25
  69:4,9,12
**distribute** 41:13
**distributed** 45:18
  72:2
**distributing** 42:5
**distribution** 54:9
**DISTRICT** 1:1,2
**doctor** 40:3 48:23
  49:18 50:18 51:21
  51:21 52:3 54:2

54:14
**document** 4:4,5,8
  12:2,5,19 13:12
  13:17 43:22 44:1
  44:24 45:20 47:7
  47:10 62:13,15
  73:5
**documents** 44:5,14
  44:15,18,21 45:5
  45:10,13,19 73:2
  73:3 74:7,9,15
**dogs** 41:6
**doing** 26:20 40:13
  62:5
**door** 37:19,20,21
**double** 56:5
**Dr** 6:12 8:15,22 9:3
  9:8,15,16 13:25
  18:15 19:4,17
  36:16 40:8,12,20
  40:24 41:5,13,19
  46:11 47:12,17,24
  48:3,3,6 49:20
  51:19,23 54:5
  66:21 67:3 68:8
**draft** 62:13
**drafted** 62:16
**drifting** 57:18
**driving** 60:25
**duly** 5:7 76:6

――――― **E** ―――――
**earlier** 18:1,11 37:5
  37:10 38:24 57:12
**effect** 36:7 51:1
**effort** 7:12
**either** 7:1 28:8
  37:21 48:13 49:20
  50:21 51:14 52:15
  62:17 67:11 68:11
  68:15,20 74:9
**elevated** 53:24
**Elizabeth** 66:22
**employed** 33:20
**employee** 33:24
**ended** 62:5

**endorse** 40:4
**engaged** 50:24 54:2
**enter** 10:15
**entered** 10:22 11:1
**entertaining** 48:23
**entice** 40:23
**enticing** 41:6
**entire** 77:11
**entirely** 16:16
**entitled** 69:3
**equivalent** 40:5,13
**ERRATA** 77:1,15
  78:1 79:1
**ESQ** 2:4,10,16
**establish** 20:1
  67:14
**estate** 6:13
**et** 1:8 77:6
**Europe** 42:4,9
**everybody** 45:19
  50:25 72:2
**exactly** 37:22 46:20
  60:11 61:9,20
**EXAMINATION**
  3:1,6 5:10
**examined** 5:8
**excuse** 48:20
**exhibit** 4:4,5,8 12:3
  12:8,12 15:5,6,10
  15:16,22 16:2,23
  17:4 19:7 24:1,9
  24:15 39:11,15
  63:16,19,23,25
  64:3,6,10,12,13
  64:15,16,18 70:10
  70:23 71:1,8 72:6
  72:7,7,15 73:4
  74:2
**exhibits** 4:1 70:9,21
  72:2,4
**expire** 51:5,16,25
  52:11 53:2 55:9
  58:1
**expired** 50:23
**expression** 46:12
**extent** 25:5

**Exuro** 40:10,21
  41:12
**e-mail** 35:5,7,19,22
  35:24 37:25 38:4
  38:20 62:12
**e-mails** 29:4,8
  30:11,14,21,24
  31:3,6,11,15,20
  32:1 34:12,14,21
  35:4,17

――――― **F** ―――――
**facility** 36:23
**fact** 14:3,6 20:17
  27:16 31:11 46:11
  53:13
**faded** 45:23
**failed** 33:2
**fair** 45:7 73:7,8
**fairly** 73:11
**fallout** 50:4
**familiar** 38:3
**far** 55:12,16 56:17
  59:2 66:17 67:17
**Fast** 4:4 12:15
**fault** 26:15
**February** 1:16 5:2
  44:23 76:16
**feeding** 39:18 51:20
**figure** 21:1 36:17
  43:18 48:4 51:17
  53:18,19
**file** 70:24
**filed** 39:2 59:2 64:3
  64:13 74:10,15
**fill** 47:18
**finally** 7:16
**find** 46:10 48:8
  53:5,9
**fine** 32:21
**finish** 51:11 70:9
**finished** 7:9,13
  41:15
**fire** 47:19
**FIREACTX7777…**
  35:9

**FIRECPX7777@…**
  38:21
**firm** 33:16,19
**first** 6:25 8:13
  10:15,21,25 11:1
  11:6,7 13:8,10,17
  14:11 16:6 18:10
  19:3 37:2 46:20
  61:4
**firsthand** 50:19
  53:8
**fit** 66:23
**five** 45:14 57:1
**floor** 2:5 42:14
**FLOWER** 2:5
**folder** 71:10,17
  72:5 73:10,14,21
  73:24 74:7
**follow** 6:24
**follows** 5:8,18
  34:19
**followup** 67:10
**forces** 40:24
**foregoing** 76:6,11
**forgot** 38:17
**forth** 49:5 76:8
**FORTY-FIFTH**
  2:5
**forward** 53:25
**four** 71:2
**frame** 36:1
**Freer** 8:20 9:6
  18:14 19:4,17
  27:10,18,24 28:4
  28:10 42:3,8 43:5
  43:7,9,18 44:4
  59:8,10,20 60:15
  66:25
**FRIDAY** 5:2
**friend** 51:18,19
**front** 12:12 15:10
  41:13
**frustrated** 53:24
**full** 17:13,15
**further** 56:18



**G**

game 45:7
general 19:24,25
generally 58:20
  72:14
gentleman 51:18
getting 36:17 52:2
  55:11 57:18
give 45:1 53:1 57:9
  60:7,20,23,24
  61:2 62:9 72:16
  73:24
given 10:8 15:3
  25:7,9
giving 6:9 14:23
  26:10,17 57:4
  60:13
glasses 71:16 73:19
go 6:23 32:20 34:9
  35:8 43:11 46:13
  46:13,15 48:23
  51:10,11 56:10
  57:6 65:2 66:24
  67:11 70:13 73:1
  73:13
goes 9:13
going 6:13 7:23
  9:11,18,20,24
  10:5,12 26:16
  27:15 29:19 37:6
  41:23 42:4,10
  43:11,12 44:3
  46:16 50:5,22
  51:4,17,24 53:13
  53:22,25 57:22
  61:6 65:14 70:6,8
  71:7,17,20 72:21
  72:22 73:13
good 48:17
governing 11:13
greet 66:3
Grossman 8:15,22
  9:3,8,15,16 13:25
  18:15 19:4,17
  36:16 40:8,12,20

40:24 41:5,13,19
  46:11 47:12,17,24
  48:3,3,6 49:20
  51:19,23 54:5
  66:21 67:3 68:8
Grossman's 6:12
group 42:8 67:1
guess 10:6 52:18
  61:17
guy 48:1,2 66:3
guys 48:1 52:1
  56:23

**H**

H 2:10,10
HAIGHT 2:4
hand 55:11 73:9
handed 12:2 43:20
handling 50:19
happened 8:13
  38:7 48:8,11
happening 53:15
happy 56:20 67:19
hard 44:22 70:15
head 7:2
hear 5:17 10:23
  14:21 34:18 41:3
  52:5 55:18,19
  65:11
heard 23:9 50:19
  53:3,7,7,10 60:18
help 13:20 47:18
hereof 77:15
hereto 12:10 15:8
  74:4
hey 61:1
He'll 53:21
Hills 4:6 14:17,24
  19:10,11,12 22:12
  22:12,15 23:10,15
  24:2,11,16 26:11
  26:18,24 36:22,25
  37:4,4,6,11,16
  48:19,20
hold 50:13,23
Holiday 42:16,18

honest 49:23 62:23
hopefully 73:11
hospital 19:12
  20:20 22:12,15
  37:6,8,13 48:20
hotel 47:23
Hunt 8:5 9:12
  11:19 16:1,3,17
  16:21 18:13,13,20
  18:22 19:14,16
  20:11,13,16,21
  21:14 22:14,19,24
  23:13 24:13,18,24
  25:3,6,8,9,15,18
  25:25 26:5,10,17
  26:20,23,25 27:3
  27:14,18,25 28:3
  28:7,9,24 29:7,14
  29:21 30:3,6,8,10
  30:13,15,17,21,25
  31:4,7,11,13,15
  31:20 32:1,9,15
  34:13,14 35:20
  36:2,5,11,14 39:3
  39:7,17 43:12
  46:7,8,17,18 47:2
  47:5,7,10,13,13
  47:20 48:7,8 49:1
  49:3,6,11,13,20
  49:25 55:11,16,21
  56:22,25 57:2,4
  57:11,15,20 58:4
  58:6,11,13,14,15
  58:24 59:7,15,19
  62:24,25 64:21,22
  65:13,16,18 66:2
  66:3,8,15,18
  67:13,18,22 68:1
  69:10,13,21,24
Hunt's 17:10,13,23
  22:22 57:5 67:15
  70:1

**I**

idea 21:18 23:8
  29:1 30:1,13 31:2

31:13 43:17 50:5
  54:2 57:25 66:14
identification 12:9
  15:7 74:3
identify 33:2
identifying 48:16
Immigration 36:9
implemented 50:22
important 7:1,10
impression 42:7,7
improper 70:6
inaccuracies 55:2
inaccurate 29:23
inappropriate 56:6
include 31:20 62:7
  64:16
included 20:21
  29:4 30:10,11,15
  30:16 72:14
including 45:20
Incorporated 7:21
INDEX 3:1 4:1
indicate 49:20
  60:18
indicated 77:14
informal 7:8
information 3:10
  4:4 12:2,16 32:3
  32:13 36:2 39:1,5
  39:18,19,23 48:7
  50:1 51:20 53:1
  55:7 57:5,15
  60:19,23
initial 20:12
initially 8:16
Inn 42:16,18
ins 37:17 59:12
inside 37:21
insist 9:18
instructing 56:8
INSTRUCTION
  3:14
intended 51:15
  52:10 57:14
intending 53:2
intensive 42:2

interactions 49:10
International 23:7
  23:19
interrupt 44:9
intervention 10:1
introduced 37:3
involved 8:14 15:21
  16:1,17 28:24
  29:4,7 36:17
  39:17 48:2 50:8
  50:10,12 57:20
  59:24
involvement 17:23
  17:25 18:2 66:11
involving 22:14
  27:24 59:1
in-house 48:18
Ireland 2:4 21:13
  21:16 27:17 33:1
  33:6,10,13,17,20
  33:23 34:4,8 44:5
  44:9 45:5,9 52:7
  56:3,8 69:1,7,9,12
  69:16,20,23 70:15
  70:17 72:25 73:9
  73:14,20 74:13,14
  74:20,23,25

**J**

JEFFERSON 2:11
Joe 40:1,11 48:24
join 40:24
judge 10:2

**K**

keep 47:18
kept 41:25 42:1
key 48:1,2,4
kind 10:15,22
  33:25 41:7 43:17
  54:1,2,11 74:16
knew 17:12,16 23:5
  23:20,23 37:18
  49:7,11,21 69:21
Knock 71:17
know 17:15 18:4,5



18:25 19:8,13,25
20:17,18 21:21,23
22:5,22,24,25
23:24 25:24 29:7
30:18,22 31:1
33:17 35:3,25
37:17 38:8,12,17
39:8 43:16 44:20
44:21 45:12,14,15
46:11,13 47:6,11
48:9,10,12,21
49:6,13 50:3,4,14
52:13 55:2,24
57:4,10 58:25
59:12 64:14 65:22
68:2 73:6
**knowing** 31:5
**knowledge** 8:7
23:13 63:13
**known** 23:14,21
37:15

### L

**LAW** 2:4,10,15
**lawsuit** 6:13 23:12
33:11 59:2,5,9,24
**lawyer** 72:25
**lawyers** 26:24
**learn** 18:6
**learned** 57:8
**leased** 37:12
**left** 43:18 47:24
**LEGAL** 1:22
**legitimate** 66:25
**let's** 32:20 46:3
56:11 57:20 64:21
67:13
**level** 42:20 66:11
**lightly** 51:9
**Limited** 11:23
12:24 13:9,11
**Line** 78:2,5,8,11,14
78:17,20 79:2,5,8
79:11,14,17,20
**list** 35:8
**listed** 13:1,4,9,10

**listen** 61:1 64:20
**listening** 9:4 41:18
47:25
**lists** 13:25
**litigation** 14:19,25
**little** 13:21 56:5,13
**LLP** 2:4
**Lobe** 26:24,24 27:3
27:3,5,5 60:10,10
60:11,11 63:10,11
**log** 38:11
**logo** 37:21
**long** 6:1,8,17 20:22
34:22 38:2,9
52:25 57:19 64:16
**look** 13:24 25:12
39:10 44:8 73:10
**looked** 43:19 74:14
74:15
**looking** 44:5,12,14
44:18 45:6,11
71:3
**looks** 44:22,23
**LOS** 2:6
**lunch** 40:3 48:23

### M

**M** 1:5 2:20 77:5
**MAGNA** 1:22
**maintaining** 9:19
**Malaysia** 67:12,16
67:25 68:21
**management** 11:22
12:23 13:5,11
14:6,12
**mark** 71:1,7
**marked** 12:8 15:6
70:22 73:4 74:2
**Marten** 8:23 15:21
65:7,13,16
**matter** 20:23 25:9
57:19 77:12
**matters** 33:16
**mean** 38:14,17
48:14 49:19 70:21
70:21 71:10

**means** 33:17
**medical** 37:14
40:10 41:12 48:20
**meet** 65:13,16,18
66:3 67:25
**meeting** 8:16,19,25
9:2,9,10 10:11
18:9,10,14,22
19:1,3,9,15,18
20:7,9,15,19 27:9
27:14,23 28:4,7,8
36:25 37:5 40:14
41:24 66:1,19
**meetings** 18:8,10
18:21 20:14,24
21:3,5,8,10,14
22:10,11,13,18,21
28:10 36:24 37:3
37:9,16 41:25
42:11,17,21 43:6
43:7,10 46:19,21
46:21 47:23 50:10
50:16 52:20
**member** 11:12,17
11:22 14:3,6,12
**members** 13:25
**Memorandum** 4:5
12:2,16
**mention** 50:15
**mentioned** 18:11
36:22 37:2 50:8,9
**message** 52:2
**met** 21:14 27:18
61:10 66:6,15
**mind** 56:1
**minute** 25:12
**mischaracterizes** 56:3
**misrepresented** 36:7
**missed** 67:17
**misunderstood** 18:16
**moment** 39:11 44:6
70:13
**Montagnac** 40:1,11

40:25 48:24 51:13
51:14 52:15 55:6
67:1
**months** 42:24 43:1
**Motion** 4:7 14:18
14:25

### N

**name** 5:12 10:25
23:9 38:16 40:2
42:15 76:15
**named** 41:4 51:19
**narrow** 43:15
**NDA** 40:11 43:19
**need** 9:25 25:12
45:17 53:21 54:17
61:2
**needed** 54:6
**negative** 50:1
**never** 17:12 23:23
42:4 62:3
**new** 8:17 9:6 41:2,3
54:2
**nice** 33:25
**nod** 7:2
**nondisclosure** 27:10,19 28:11
**nonverbal** 7:4
**Non-Circumvent...** 4:9
**NORTH** 1:18
**notice** 72:12
**number** 70:11 71:1

### O

**oath** 5:7 61:13
77:17
**object** 10:12
**objection** 7:25 56:3
**objections** 70:4
**obtain** 17:22 32:3
41:17
**obviously** 37:12
45:18
**occur** 19:1 42:21
**occurred** 22:14

42:22
**offer** 77:16
**offhand** 34:16
**office** 36:23 37:24
48:19 61:11 62:21
63:11
**offices** 2:4 37:1,7
37:10,12,14 48:21
66:7
**oh** 12:7 45:12 64:1
73:20
**Okay** 6:9,17,20
11:17 12:22 18:17
18:18 21:16 24:5
24:19 28:1,5,9
34:8,10 37:9,15
39:19 43:11 44:21
45:8 52:9 55:10
58:3 63:21 64:3
64:20 67:17 72:3
72:20 73:9,22,25
74:19
**once** 42:20 47:19
**Opposition** 4:7
14:18,24
**orally** 6:5 61:14
**order** 10:7 28:18,20
29:13 30:20 31:24
32:2,8 70:18,19
**original** 57:14
**outs** 37:17 59:12
**outside** 7:24 8:4
9:19,22 10:6,18
11:3,9,14,19,24
13:6,13,18 14:8
14:14 15:1,13,17
15:23 16:13,25
17:6 24:5,19
25:20 26:7 27:6
27:11 28:15,19
29:6,11 30:12
31:8,22 32:5,10
32:16 63:5 65:4
65:17 68:12,17,22
69:2
**o0o** 75:4



**P**

page 3:6 4:3 12:18
12:20,23 13:24,24
14:7 78:2,5,8,11
78:14,17,20 79:2
79:5,8,11,14,17
79:20
pages 70:11
paid 23:23
paper 6:15
papers 70:25 71:4
71:11,19,21 72:3
72:8,10,21,23
74:18
paralegal 33:15,18
part 13:9,10 16:6
55:18,19
partial 57:9
participation 22:23
55:8 57:25
particular 12:5
party 33:10,23
PASADENA 1:18
pass 42:16 47:15
passing 58:25
patents 50:20 51:1
51:4,15,24 52:10
53:2 54:12 55:9
58:1
paused 26:15
paying 51:9
penalty 77:8,10
people 7:8,11 8:20
8:21 42:8 48:16
61:12 73:5
percent 16:10
period 42:23 43:15
perjury 77:8,10
permissible 57:12
person 25:1 41:14
72:19
personal 71:19
perspective 60:16
pertain 58:6 71:24
pertained 57:15

pertaining 39:16
pertains 30:12
56:24 57:3 58:4
Peter 51:19,23
53:12,20
phone 2:14,20
54:20,24 55:1,3
photocopy 45:1
picture 54:7
pile 70:10
place 19:2 22:10,17
42:13,14,17 43:17
43:21 53:11 76:8
Plaintiff 1:6 2:9
plaintiff's 70:18
plan 12:6,7 41:1,2,3
41:10,11 54:9
55:8 72:4
planned 41:20
plans 42:2 54:11
players 48:13 52:18
pleadings 45:18,20
please 7:25 10:4,24
15:3 16:7 38:19
74:25
point 33:3,7 40:23
46:22 48:5 49:18
50:14 57:1,21
66:13
position 11:6,7
17:21 23:1
positive 16:20 51:6
possible 16:5,8 21:7
26:21 30:3,24
31:3 54:7 55:5
possibly 42:25 59:7
present 2:20 18:14
19:14 27:14,23
28:3 32:24 33:1,5
33:7,14 34:2,6
40:14 47:10 52:20
presentation 9:3,5
presented 40:10
47:7,21
presenting 46:23
pretty 45:23

previous 6:23
57:13
previously 7:20
pro 56:5
probably 22:3,3
43:20 44:11 55:10
problem 72:20
problems 42:5
proceed 62:23
proceedings 75:2
76:9,12
produce 44:24
produced 44:15,19
44:20 70:23 71:23
72:1
product 9:6 28:14
28:25 41:11,21
propose 73:20
propounded 74:10
provide 36:2
provides 33:16
PTE 7:21 11:23
12:24 13:9,11
14:4,7,13 23:22
public 68:15
pure 41:5
purpose 66:1
purposes 71:22,25
Pursuant 4:8
purview 23:8
put 39:1,24,25
45:21 61:13 62:2
63:21 73:10,16
P.M 1:16,16 75:3

**Q**

question 6:25 7:1,9
7:23 8:3,8 9:21,25
10:1,2,4,9,13,19
10:23 11:4,10,15
14:21 16:6,14
24:7 26:1,3,16
28:1,6,22 29:3,20
30:2,5,7,12 39:16
44:3,17 49:15,16
50:9,11 55:13,25

56:12 57:11,14
58:5,8 60:21 63:1
64:8
questions 6:4,14,16
7:13,17 9:11
28:19 30:17 42:1
43:13 56:18 57:2
57:12,13 61:13,14
62:8 64:20 69:17
70:7 71:22 72:1,8
74:8,17
quicker 13:22
quickly 73:12
quite 36:6 41:25
42:2

**R**

range 8:7
RAYMOND 1:18
reach 49:2
reached 49:3
read 5:18 34:19
44:23 73:2 77:11
77:12
reading 38:23
real 56:20
really 8:21 17:12
20:5 23:4 47:6
48:12 49:23 58:18
59:3,12 60:5
reason 33:13 38:10
41:7 46:8 49:25
78:4,7,10,13,16
78:19,22 79:4,7
79:10,13,16,19,22
recall 5:25 6:21
8:24 16:3 18:12
20:5,8,22 21:6,9
22:9,14,16,21
26:20,22,25 28:7
28:9,12 31:5
34:16,21 35:12
36:12 39:17 43:4
48:11 49:4,10
52:23 58:12,19,20
62:14

receive 31:6,11,14
34:12 35:4 55:7
received 30:21,25
30:25 31:3,4,13
31:16 32:13 34:14
48:7 54:20,25,25
Recess 32:22 46:4
74:5
recognize 38:20
recollection 39:12
record 5:13,18 9:25
26:16 32:20,24
33:21,24 34:19
45:22 57:23 70:13
70:18 71:21 73:2
76:12
recorder 61:19
recording 61:16,21
61:23
refer 39:15
reference 41:5
referring 45:20
reflected 14:7
refresh 39:11
refusals 70:5
refuse 9:24 11:24
13:21,22 14:5,9
14:15 15:14,19,24
16:14 69:6
refused 30:5
refusing 8:3 9:21
9:25 10:2,6,9,13
10:19 11:4,10,15
11:20 13:15 16:18
17:2,8 24:7,21
25:22 26:8 27:7
27:12 28:16,21
29:12 30:7,19
31:9,23,25 32:7
32:11,17 55:13,22
58:5,8 63:1,6
64:25 65:5 67:20
67:24 68:13,18,23
regarding 17:23
27:10 28:10 29:8
30:11,22 31:6,12



31:18,21 32:3,14
36:3 39:2,5,20,23
39:25 46:7,9,19
47:14 49:1,22
50:2,7 52:21 55:7
57:25 58:11 62:13
69:4
**regards** 36:17
**relate** 55:16
**related** 43:21 55:21
**relating** 51:21
**relationship** 8:11
10:16,22 11:1
**relief** 4:4 12:15
28:13,25
**remember** 6:9,22
8:20,21 14:20,23
16:5,9 19:2,22
20:20 21:11 22:5
22:11,17 28:6
31:19 35:25 36:6
37:6,22 42:15,22
47:15 49:24 50:18
52:12,17,18,24
59:6 61:9,20,25
62:11,17,18,22
64:1 65:19 68:2
**renewal** 50:21
**repeat** 10:24 14:21
16:6 24:14 27:15
28:2 39:4 64:7
65:11
**reported** 76:9
**reporter** 5:8,18 7:3
7:11 12:9 15:7
34:19 45:21 61:18
70:20 74:3,23
76:3
**REPORTER'S**
76:1
**represent** 40:24
69:7
**representative** 67:3
**REQUESTED** 3:10
**Research** 4:6 14:18
14:24 23:10,15

24:2,11,16
**response** 9:9,17
10:11
**restaurant** 42:15
42:18 47:23 53:4
53:7,10
**review** 63:3
**reviewed** 25:11
71:25 72:4,8 74:6
**reviewing** 71:21
**Richard** 6:12
**right** 37:7 47:24
54:17,18 62:10
74:1,6
**roadrunner.com**
38:15
**role** 17:10 66:15,17
67:15,15,17,20,21
**rules** 6:24 28:17

――――――――――
**S**
――――――――――

**s** 4:7
**safely** 42:12
**SAM** 2:16
**Sandoval** 36:3,5,7
36:15,19,21 39:3
39:5,15,20,23
40:1,1,25 43:20
46:7,9,17,21,23
47:2,5,8,14,21
48:6,9,18,22 49:2
49:8,12,14,22
50:2,7 51:3,7,13
51:14 52:16,21
55:6 56:16,21
57:16 67:1
**save** 77:13
**saw** 62:3,7 67:22
**saying** 14:12 16:16
16:20 18:12,13,16
18:19,20 19:22
22:7,13 24:23
27:2 29:17,17,22
36:25 47:8 51:3
51:24 52:1,9 54:6
58:6 59:18 67:2

**says** 12:2,15,23
**scenes** 50:5
**scope** 7:24 8:4 9:19
9:22 10:7,18 11:3
11:9,14,19,24
13:6,13,18 14:8
14:14 15:1,13,17
15:23 16:13,25
17:6 23:16 24:5
24:19 25:20 26:7
27:6,11 28:15,20
29:6,11 30:13
31:8,22 32:5,10
32:16 43:14 63:5
64:21,24 65:4,17
68:12,17,22 69:2
**Scully** 2:10,10 12:4
12:7 32:19 39:10
39:14 43:25 45:1
45:12,23 46:3
52:6 56:1,11 64:7
70:8,24 71:4,7,10
71:18 72:14,19
73:1,7,10,16,23
74:6,17
**se** 56:5
**second** 7:7 50:13
**see** 7:3 12:24 13:2
13:17,25 14:1
25:12 35:16 37:17
43:5,9 62:17,25
66:24
**seen** 30:15 43:7,25
61:21
**sent** 27:3,5 31:21
31:25 35:5 62:21
**separate** 28:2 41:1
**Sepulveda** 42:16
**served** 60:1
**service** 35:2
**SERVICES** 1:22
**set** 76:8
**setting** 41:9,11
**shared** 31:7
**shareholders** 54:13
58:2

**SHEET** 77:1,15
78:1 79:1
**SHERMAN** 2:16
**shift** 57:25
**ship** 55:8
**Shorthand** 76:3
**shoulder** 74:15
**showed** 34:1
**showing** 47:8
**side** 48:13 60:9
**sides** 40:22
**sign** 15:16,21 16:1
**SIGNATURE**
78:24 79:24
**signed** 15:12 40:11
63:10 64:19 77:18
**SiMTech** 28:14
**Singapore** 65:2,7
65:14,18 66:9,12
66:16,19,22 67:2
67:5,8,9,16,22,25
68:10,21
**sir** 9:24 33:3,8 44:5
**sitting** 34:1 41:18
47:24 62:20
**situation** 57:5
**SK** 1:5
**smoothly** 53:25
**somebody** 6:14,16
16:12,17,18 27:2
52:9 59:7,19
60:19 61:16
**somewhat** 38:3
**soon** 53:15 54:7
72:7
**sorry** 12:4 24:14
26:15 39:4,14
41:15 44:9 47:3
55:19 56:4 58:14
64:7,24
**sort** 7:7
**sounds** 38:3
**SOUTH** 2:5
**so-called** 51:19
**speaking** 7:12 46:8
51:7

**Special** 4:7
**specific** 58:19 73:5
**specifically** 37:22
52:2 59:16
**spoke** 26:4
**spokesperson**
66:10
**stack** 45:10
**stages** 20:12
**start** 7:8,14
**started** 23:12 48:22
50:4
**state** 5:12 14:19,25
24:1 26:13,19
32:23 39:2,6
39:14 64:11
**stated** 18:1 24:10
64:11
**statement** 62:4,4,9
63:3,8,9,10
**statements** 16:23
17:4 55:5
**states** 1:1 41:2 42:6
50:25 63:19
**status** 11:7
**stay** 70:17
**stenographically**
76:9
**stockholder** 54:3,5
**street** 2:5,16 60:25
**Strike** 4:7 14:19,25
**stuff** 39:21,25
47:17 62:24
**subject** 19:18 20:23
70:4
**submit** 64:12
**subscribed** 76:15
**subscript** 23:24
**subvert** 54:11
**sucking** 41:8
**sued** 61:1
**suggest** 26:23 70:8
**suing** 59:8,19,22
60:15
**suit** 59:10
**SUITE** 1:18 2:11



2:17
**sunburn** 28:13,25
**support** 4:6 14:17
   14:23 15:4 24:1
   24:11,16 26:11,18
**supposed** 8:5
**supposedly** 41:4
**sure** 6:11,17 7:4,13
   16:10 21:8 26:3
   28:3 33:25 43:25
   44:7 46:20 47:11
   51:6 70:16
**surprised** 34:8
**SUSSMAN** 1:8
   77:6
**sworn** 76:6

— **T** —
**table** 73:10
**take** 7:4,11 19:9
   22:10 32:18,19
   41:11,20 42:13
   44:7 46:1,3 54:12
   73:20,23
**taken** 5:15,19,24
   6:8 54:12 58:2
   72:22 76:7,12
   77:11
**takeover** 54:3,5
**takes** 50:21
**talk** 41:18 54:6
   56:2,15 72:19
**talked** 19:21 20:20
   48:25
**talking** 6:2 19:15
   21:10 39:20 40:16
   40:17 48:9 54:10
   56:17,20 65:12
   71:9
**tape** 54:20,23,25
   55:1,3 61:19
**TBrady1@Road...**
   38:1,16
**teaming** 56:5
**tell** 9:18 25:15,18
   34:4 36:5 53:12

**thinking** 48:12,14
**Thomas** 1:14 2:10
   2:10 3:3 5:1,6,14
   74:7 77:22 78:25
   79:25
**thomas@thomas...**
   2:12
**thought** 37:5 41:6
   42:3 45:3 48:17
   62:17
**three** 6:19 42:12,17
   42:19 52:1,14,19
   70:20
57:17 59:16,17
   60:10,13 61:10
   67:20 69:23
**telling** 9:22 26:6,25
   28:23 42:7
**ten** 21:20 22:4,8
   57:1
**terms** 48:12,15
**Terrence** 1:5 2:20
   77:5
**testified** 5:8 29:14
   29:21 30:3 32:14
   37:10 46:6
**testify** 55:16
**testifying** 55:21
   57:7
**testimony** 29:22
   34:6 56:4 57:9
   70:2 76:8,12
**Thank** 74:19,21,22
**therefor** 72:1
**thing** 7:7 49:5
   56:23 59:6
**things** 40:17 57:7
   70:9
**think** 6:7 12:4 18:2
   25:13 29:20 38:10
   39:14 43:13,23
   45:6,17 47:22
   49:13,25 50:13
   53:3 58:18,21,21
   66:23 70:11,17
   71:2 74:20

**throw** 44:10 51:17
**time** 5:23 6:8 7:12
   8:17,21 35:25
   43:15 57:19 59:13
   60:6 63:14 64:19
   66:12 67:10 70:7
   72:19 73:24 76:8
   76:13
**times** 20:14 67:8
**titled** 4:4,5,8
**today** 38:11 44:25
   70:23 71:5
**told** 25:24 41:20
   42:11 46:18 51:3
   51:23 52:9 57:23
**Tom** 4:6 15:4
**top** 42:14,16
**transcribed** 76:10
**transcript** 61:24
   62:3,8 77:11
**transpired** 62:14
**triggered** 50:3
**trip** 66:23 67:10,25
   68:5,11,20
**trips** 67:11,15
   68:16
**true** 53:6,10 76:12
   77:13
**trusted** 42:9 46:17
   47:8
**try** 38:14,17
**trying** 8:6 20:1 21:1
   27:17 36:16 40:2
   40:3,5,7,12,23
   43:15,16,17 48:7
   53:18,19 54:16
   56:22 57:17 58:21
   64:22 67:14
**turn** 12:18
**two** 6:12 7:11 22:1
   22:4,4 40:22 41:5
   42:19 70:10
**two-part** 28:1,6
**type** 49:5
**typewriting** 76:11

— **U** —
**understand** 7:17,25
   17:14 24:10 26:1
   26:4 49:19 55:24
   60:21 64:18
**understanding** 8:5
   17:10,18,20,22,24
   23:16 24:3,12,17
   25:2 29:20 30:2
   41:10,17,22 46:25
   48:19 51:12 59:18
   60:3,5 77:16
**understood** 17:12
   37:23 41:16 51:2
**United** 1:1 41:2
   42:6 50:25
**upset** 54:4
**use** 21:1 41:13
**user** 38:16

— **V** —
**valet** 66:4,5
**Ventola** 2:15,16 3:6
   5:11,22 9:11 12:1
   12:6,11 15:3,9
   21:15,19 27:20,22
   32:21,23 33:4,9
   33:12,15,18,22
   34:3,7,10,11,23
   39:22 44:2,13
   45:10,17 46:1,5
   52:8 56:7,12,14
   64:9 70:4,16,21
   71:13,20 72:5,9
   72:18,21 74:1,21
**Ventolalaw.com**
   2:18
**visit** 26:24
**vs** 1:7 77:6

— **W** —
**wait** 7:13 44:6
**walked** 73:16
**walks** 34:5
**want** 6:19 32:19
   44:10 47:16 57:6

57:9 62:23 67:18
   71:16 73:5 74:8
**wanted** 60:16 61:5
   62:9 74:12
**wasn't** 22:5 34:1
   48:12,16 51:21
   53:25
**way** 31:5 55:20
   57:6 58:7 64:20
   69:2 73:1
**ways** 55:15
**weeks** 42:23,25
   43:2
**weird** 52:5
**went** 37:19 49:10
   49:24 61:7,8,11
   67:2,10,22 73:18
**weren't** 48:14
**West** 4:6 14:17,24
   19:12 22:12,15
   23:10,14 24:1,11
   24:16 26:11,18,24
   36:22,25 37:4,6
   37:10,16 48:19,20
**we'll** 56:13 71:1
   73:6,23
**we're** 24:5 52:6,7
   54:16 55:11 57:1
   57:6,17,18 71:7
   74:20
**WHEREOF** 76:15
**wife** 33:4,7 66:22
**WILLIAM** 2:4
**willing** 28:18 55:16
   56:2,15,17 57:9
   60:23 61:2
**Wireland@hbbl...**
   2:7
**witness** 3:3 5:21
   12:1 15:3 21:17
   27:21 34:9,21
   39:13,19 44:7,10
   45:3,8,14,25 56:4
   71:3,6,9,12,19
   72:3,6,16,20,24
   73:8,13,15,18,22



73:25 74:19 76:6
    76:15
**woman** 33:25
**wondering** 52:4
**Woodland** 19:10
    19:11 22:12 37:4
**working** 28:13,24
**wouldn't** 35:25
    53:11
**writing** 6:5,15 62:5
**written** 58:23 61:22
    62:13
**wrong** 18:3 29:17
**wrote** 62:4
**www.MagnaLS.c...**
    1:23
**Wyles** 1:5 2:20 20:9
    21:2 30:11,22
    31:4,7,12,18,21
    32:1,24 33:2,4,6
    33:10,15,18 34:15
    50:7,15,19 51:4
    51:15,24 52:10
    53:2,14,17,21
    54:7,11,17,18
    55:8 57:8,25
    58:11,14,14,15,24
    59:7,9,11,19,22
    60:15 61:1 63:19
    67:1 77:5

_____
**Y**
**yahoo** 35:10,13,16
**yeah** 32:19,21
    38:19 39:13 42:19
    42:25 46:3 70:24
**year** 43:3
**years** 6:8,19 19:2
    36:12
**Young** 1:21 76:3,21

_____
**Z**
**ZACHARY** 1:8
    77:6

_____
**1**

**1** 4:4 12:3,8,12
    39:15 72:6
**1:06** 1:16
**10736** 2:11
**11461** 1:21 76:21
**117** 2:11
**12** 4:4
**15** 4:5
**16** 12:18,21 14:7
**1650** 2:17
**17** 13:24
**17th** 76:16
**1775** 2:16
**18** 44:23

_____
**2**

**2** 4:5 15:5,6,10,16
    15:22 16:2,23
    17:4 19:7 22:2
    24:1,9,15 39:11
    39:15 63:16,19,23
    63:25 64:3,6,10
    64:13,15,16,18
    72:7
**2:17-cv-07722-D...**
    1:5
**20** 21:22 77:19
**2012** 27:9,19,24
    28:4
**2013** 8:12,13 44:11
    44:22,23
**2014** 44:11
**2017** 60:1
**2020** 1:16 5:2 76:16
**205** 1:18
**213.542.8000** 2:6

_____
**3**

**3** 4:8 72:7 74:2
**3rd** 27:9,24 28:3
**3:50** 1:16 75:3
**30** 1:18 21:24 22:2
**303.864.9797** 2:18
**310.351.1119** 2:12

_____
**4**

**4** 70:19 71:8
**425.16** 4:8

_____
**5**

**5** 3:6
**553115** 77:4
**555** 2:5

_____
**7**

**7** 1:16 5:2 12:23
**74** 4:8

_____
**8**

**80203** 2:17
**866.624.6221** 1:22

_____
**9**

**90** 16:10
**90071** 2:6
**90230** 2:11
**91103** 1:18

